ALLEN, J., did not sit.
The action was brought to recover the sum of $420, with interest, it being the total of plaintiff's monthly dues as a member of the defendant order from 30 May, 1902, until 1 December, 1916, which were paid by him to it during said time.
Plaintiff based his right to recover upon the ground of fraud in procuring him to become a member of the order in 1902, the fraud consisting in the false representations of the defendant's soliciting agent as to the amount of dues to be paid by him each month during the continuance of his membership; and as a second ground of recovery, that if the contract between them is valid, the defendant has committed a breach of the same by increasing the rate of monthly payment from $2.40 to $4.65.
The defendant denies the allegations of fraud and avers as to the other ground of recovery that it had the lawful right to increase its rate of payment for each month, as will appear hereafter.
These two questions will be considered in their reverse order, the first question now being the one in respect to the breach of the contract. The record is large and we will only state, and as briefly as possible, the salient facts of the case.
Under the authority conferred by the general laws of Massachusetts, to organize fraternal beneficiary corporations, in 1877, there was issued *Page 655 
to designated persons a certificate of incorporation under the name of the Supreme Council of the Royal Arcanum. By the constitution and by-laws, referred to in the certificate, the corporation became what is known as a fraternal association under the lodge system. Its principal objects, as stated, were:
1. To unite fraternally all white men of sound bodily health and good moral character, who are socially acceptable and between 21 and 55 years of age.
2. To give all moral and material aid in its power to its members and those dependent upon them.
3. To educate its members socially, morally and intellectually; also to assist the widows and orphans of deceased members.
4. To establish a fund for the relief of sick and distressed members.
5. To establish a widows' and orphans' benefit fund, from which, on satisfactory evidence of the death of a member of the order who has complied with all its lawful requirements, a sum not exceeding $3,000 shall be paid to his family or those dependent on him, as he may direct.
There was power conferred by the constitution and by-laws to subsequently amend the same in the manner therein provided. The general governing power of the order was vested in the Supreme Council, and the administration of its affairs, under the supervision of (617) such council, was entrusted to the officers named in the constitution. Authority was given to the Supreme Council to sanction the organization of local lodges or councils, upon whom were conferred certain powers not in any way conflicting with the constitution and by-laws of the order, and the members of such local lodges or councils were required to be members of the order and were subject to the duties and responsibilities which resulted from that relation and enjoyed also the resulting benefits.
Pursuant to the constitution, under due authority, there was organized in the State of North Carolina, at Louisburg, a local lodge or council, known as the Tar River Council, No. 1875, of the Royal Arcanum. In 1901, James W. Hollingsworth, the plaintiff, first joined the local council as one of its original members; but the next year, that is, in 1902, he made application for another benefit certificate, increasing the amount of his insurance from one thousand to three thousand dollars.
The material terms of plaintiff's application for a benefit certificate were as follows:
"I direct that in case of my decease all benefit to which I may be entitled under the Royal Arcanum be paid to Lula M. Hollingsworth. *Page 656 
related to me as wife, subject to such future disposal of the benefit as I may in the future direct, in compliance with the laws of the order; . . . that I will, and they (my beneficiaries) shall, conform to and abide by the constitution, laws, rules and usages of said council or order now in force or which may hereafter be adopted by the same."
Thereupon the benefit certificate which has been sued on in this case was issued to the plaintiff, and is known as Exhibit A in the record. Among other things, it provides as follows:
"This certificate is issued to James William Hollingsworth, a member of Tar River Council, No. 1875, of the Royal Arcanum located at Louisburg, N.C. on evidence received from said council that he is a contributor to the Widows' and Orphans' Benefit Fund of this order . . . and upon condition that such member comply in the future with the laws, rules and regulations now governing the said council and fund or that may hereafter be enacted by the Supreme Council to govern said council and fund . . . These conditions being complied with, the Supreme Council of the Royal Arcanum hereby promises and binds itself to pay out of its Widows' and Orphans' Benefit Fund to Lula M. Hollingsworth, wife, a sum not exceeding $3,000, in accordance with and under the provisions of the laws governing said fund,. . . provided that said member is in good standing in this order at the time of his death."
At the bottom of this certificate was written the words: "I accept this certificate on the conditions named therein. James W. (618) Hollingsworth."
In plaintiff's application for membership and benefit certificate there is no statement as to the amount of monthly assessments which the plaintiff was required to pay. Both the application for membership and the benefit certificate expressly provide that the member shall comply with all the laws of the order, and particularly "with the laws, rules and regulations now governing the said council and fund (Widows' and Orphans' Benefit Fund), or that may hereafter be enacted by the Supreme Council to govern said council and fund."
The assessment rates were fixed by the general laws of the order, and the way a member ascertained what amount of assessment he was to pay was not by referring to his benefit certificate, but by examining section 430 of the general laws of the order, which governed the Widows' and Orphans' Benefit Fund and which fixed the amount of assessment rates paid by the members of the order. As shown above, these general laws were expressly made a part of the contract.
The plaintiff, in 1901, first applied for and received a certificate for $1,000, and the next year, on his further application, it was increased *Page 657 
to $3,000, and his monthly assessment was accordingly fixed at $2.40, which was the proper amount for his then attained age. The rates of assessment were fixed by the general laws, and these laws were themselves subject to be changed or modified in the manner prescribed. By subsection 3 of section 430, which was in force at the time the plaintiff became a member, the general law prescribed that the applicant should pay the amount fixed for his age, "and the same amount on each assessment thereafter whilst he is a member of the order." In other words, it was assumed at the time these rates were fixed that they would be sufficient, and that the member would pay during his entire membership the same rate that he paid at the time of joining the order. But more of this hereafter.
Article VI of the general laws of the Royal Arcanum contains the laws applicable wholly to this Widows' and Orphans' Benefit Fund, and section 430 (it being the section fixing the rates of assessment), which was introduced in evidence by the plaintiff, is part of these general laws governing this fund.
This Widows' and Orphans' Benefit Fund is diminished from time to time by payments to the widows and orphans upon the death of members, and the only way the fund can be replenished is by assessments upon the members. The amounts paid in as assessments were not allowed to be diverted to any other purpose, and the defendant order had no other assets out of which to meet the payment of these benefit certificates, except the aforesaid fund.
It appears that the salaries of officers and other expenses of the order are paid otherwise than from the widows' and orphans' fund — that is, by a system of per capita taxes having no connection (619) with the widows' and orphans' fund; and it further appears that in respect to its expenses, the affairs of the order have been prudently and economically administered.
In 1905 it was found that the Widows' and Orphans' Benefit Fund would not be sufficient to pay the losses for which it was created at the then rate of assessments fixed by the order, that is, estimated at the attained age of the member at the time of his entrance into the order, and this solution, if not improved, threatened bankruptcy or the dissolution of the order.
In 1905 the Supreme Council at its session made two important changes in the general laws:
1. It provided several different tables of rates which were to be applied to the different plans or options as they might be selected by the members. For the purpose of this case, it is only necessary to allude to two of these options: *Page 658 
(a) Under one of them a member was required to pay a certain rate up to the age of 65 years, and then at that age the rate was increased considerably.
(b) Under another option, a member was required to pay the same rate throughout life.
The last option referred to offered a plan of identically the same character as had already obtained prior to 1905 in the order — that is, the rates were expected to remain the same throughout life.
2. The second important action taken by the Supreme Council in 1905 was that all the members of the order were required to pay new assessment rates as of the age attained by each member on 1 October, 1905, instead of continuing to pay upon the rates fixed as of the time that the member joined; and this was true no matter which option was selected by the member.
Under the action taken in 1905, it was open to the members to select any one of the several options above referred to, yet if such member did not indicate which one of the options he desired to take, he was automatically put upon that table of rates which required him to pay a certain rate up to 65 years of age, and then increased his rates very much higher at 65 years.
Following the raise in rates in 1905, there were vigorous objections on the part of the members, upon the ground not only that the plans adopted in 1905 were illegal, but that the new rates then adopted were excessive and would raise more revenue than was necessary; however, it turned out that the raise in rates in 1905 was not high enough, and the executive officers of the defendant order began to realize in the year 1912 that deficit created in the Widows' and Orphans' Benefit Fund on account of the excess of payments over receipts was very (620) large.
It appears from the testimony of Mr. Hoag, who was Supreme Secretary of the order continuously from 1901 to 1917, and even after that time, and was well informed as to its financial operations and its general management, that from 1911 to 30 September, 1916, the disbursements exceeded the receipts more than $3,200,000, the receipts being $36,394,389.13 and the disbursements $39,572,529.34, and that in this State the members, since the organization of the order up to 31 December, 1916, had contributed to the Widows' and Orphans' Benefit Fund $2,368,824.92, and out of that amount there has been paid to members $2,730,306.47, leaving a deficit on this State's transactions of $361,481.55. At this juncture in its affairs, the order employed two actuaries of reputation and experiences to examine its records, books *Page 659 
and papers, and recommended for the future management of the order a scheme of assessments which would enable it to live within its means. In order to understand their report, as specially applicable to this case, we state substantially the testimony of the two actuaries taken in the cause:
Until 1898, the assessments paid by members, from which the death benefits were derived, were certain sums dependent upon the age of the member at the time of receiving his certificate which sums remained the same as the years went by. These sums were paid to meet assessments as members died, and the amount for the first year would equal the cost to the corporation of the insurance of these members. But as the members grew older the risk of their death increased, and as their payments remained constant, and as there was at no time a payment of any surplus beyond the amount required to meet losses, the payments by members of long standing were not nearly enough to equal the cost of their insurance to the corporation. So the only way in which the amounts required to meet losses could be obtained was from the payments made by new members. In 1898 the by-laws were amended so as largely to increase the payments to be made by all members, and to require the payments monthly. These amendments went into effect on 1 August, 1898, and it appears that no objection thereto has ever been made by any member of the order. These payments, while much larger than those required by the original by-laws were upon the same relative basis; that is, the increase upon all was in the same proportion, and they were all determined by the age of the member when he received his certificate, and were not to be afterwards changed as a member grew older. When these amendments were made, it was thought that the increase would provide for the future payments called for by the certificates, and that an adequate emergency fund would be created from this income. Under these amendments there was a surplus in 1898 from the excess of receipts above payments amounting to more than $455,000, and afterwards there was annually a steadily (621) diminishing surplus from the same cause to and including the year 1903. In the year 1904 the payments exceeded the receipts and there was a large deficit ($271,540.50). Before the session of the Supreme Council in May, 1905, the executive committee caused mortality tables of the order to be prepared and made extended investigations and studies with the aid of competent actuaries to devise some method, through a change of by-laws, which should enable the corporation to meet its obligations to members. The actuaries prepared for them new tables, each the mathematical equivalent of the others, the first being the regular rates, and three others optional alternatives. These founded upon *Page 660 
the payment by the order of the maximum value of each certificate and the payment of a rate adequate, without further modification or additional assessment, to pay the certificate at the maturity. Competent actuaries testified that the old plan of assessments was faulty, according to the assumptions made by actuaries and that the order could not meet the maximum face value of its certificate permanently under it; that upon their assumptions, a change was expedient, or necessary; that the plans proposed and adopted were mathematically correct; that if the members paid the amounts fixed in these tables the order could continue to pay the maximum face value of its certificates at their maturity; that such amounts are no higher than necessary for this purpose, and that they fairly and equitably apportion among the members their contributions to the Widows' and Orphans' Benefit Fund, taking into consideration their age and risk. The actuaries went into much detail of statement as to the condition of the order, showing its inevitable and imminent insolvency unless the proposed change was adopted, and that the order was actuarially if not commercially insolvent.
It appears from this testimony that the general plan as to the raise of rates in 1916 was identically the same as that in 1905; that is to say, in 1916 just as in 1905, all of the rates were increased and all of the members were placed upon rates as of their ages attained on 1 December, 1916.
It appears in the case that the Supreme Council is made up of certain high officers of the order, who are ex officio members, and of delegates elected by the great councils, the latter being composed of delegates chosen by the subordinate councils, such as the one to which the plaintiff belonged; in other words, the organization is like a republic and its laws are made by delegates elected by the members. At the meeting of the Supreme Council in 1916, when the change of which the plaintiff complains was made, the councils (grand and local) in this State were represented by three members, or delegates, Dr. J. Howell Way, Harvey B. Craven, and S. M. Brinson, all of whom voted in favor of the new rates adopted at the meeting of 1916.
(622) The defendant was duly authorized to do business in this State when the plaintiff became a member of the order and when the assessments were made.
The following are the extracts from our statutes which are pertinent to the case:
Revisal, sec. 4806, being Acts of 1899, ch. 54, sec. 2, as amended by Acts of 1901, ch. 705, sec. 1, is as follows: "All contracts of insurance on property, lives, or interests in this State shall be deemed to be made *Page 661 
therein; and all contracts of insurance, the application for which is taken within this State, shall be deemed to have been made within this State, and shall be subject to the law thereof."
Revisal, sec. 4791 (Acts of 1899, ch. 54, sec. 84, amended by Acts of 1903, ch. 438, sec. 9): "All contracts must be in accord with charter and by-laws. Every policy or certificate or renewal receipt issued to a resident of this State by any corporation, association, or order transacting therein the business of insurance upon the assessment plan, shall be in accord with the provisions of the charter and by-laws of such corporation, association, or order, as filed with the Insurance Commissioner. And it shall be unlawful for any such domestic or foreign insurance company or fraternal order to transact or offer to transact any business not authorized by the provisions of its charter and the terms of its by-laws or through an agent or otherwise to offer or issue any policy, renewal, certificate or other contract whose terms are not in clear accord with the powers, terms and stipulations of its charter and by-laws."
Revisal, sec. 4792: "Every domestic insurance company, association, or order doing business on the assessment plan shall collect and keep at all times in its treasury one regular loss assessment sufficient to pay one regular average loss."
Revisal, sec. 4793: "If any such corporation or association or order shall at any time fail or refuse to comply with the provisions of the two next preceding sections, or section 4713, the Insurance Commissioner shall forthwith suspend or revoke all authority to such corporation, association, or order, and of all its agents or officers to do business in this State, and shall publish such revocation in some newspaper published in this State."
Revisal, sec. 4794: "Nothing in the general insurance laws, except such laws as apply to fraternal orders, shall be construed to extend to benevolent associations incorporated under the laws of this State that only levy an assessment on the members to create a fund to pay the family of a deceased member and make no profit therefrom, and do not solicit business through agents."
Revisal, sec. 4795: "Every incorporated association, order, or society doing business in this State on the lodge system, with ritualistic form of work and representative form of government, for the (623) purpose of making provision for the payment of benefits in case of death, sickness, temporary or permament [permanent] physical disability, either as the result of disease, accident or old age, and formed, and organized for the sole benefit of its members and their beneficiaries, and not for profit, is hereby declared to be a `fraternal beneficiary order, society, *Page 662 
or association; and such order, society, or association paying death benefits may also create, maintain, apply or disburse among its membership a reserve or emergency fund as may be provided in its constitution or by-laws; but no profit or gain shall be added to the payments made by a member."
Revisal, sec. 4796: "The fund from which the payment of benefits, as provided for in the next preceding section, shall be made and the fund from which the expenses of such association, order, or society shall be defrayed shall be derived from assessments or dues collected from its members. Such society or association shall be governed by the laws of the State governing fraternal orders, and shall be exempt from the provisions of all general insurance laws of the State, and no law hereafter passed shall apply to such societies unless fraternal orders be designated therein."
All of the above sections of the Revisal are taken from the Public Laws of 1899, ch. 54, as subsequently amended, the annotations appear in the original edition of the Revisal and in corresponding sections of Pell's edition.
The court submitted this issue to the jury:
What amount, if anything, is the plaintiff entitled to recover of the defendant? Answer: "Nothing."
The plaintiff requested the court to submit two other issues as follows:
1. Did the defendant falsely represent to the plaintiff that his monthly assessment would never be changed, but would remain the same as long as a member?
2. Was the plaintiff by said false representations induced to take out the contract of insurance?
The court refused to submit these issues, and plaintiff excepted. Judgment was entered on the verdict, and plaintiff appealed to this Court.
after stating the case: It appears that a great corporation, managing and controlling important financial interests for hundreds of thousands of families, was conducting its business upon (624) unsound principles, which if followed without change would ultimately lead to financial ruin. The first question is, Was the change adopted in excess of defendant's corporate powers, or in violation of the statute governing such corporations? *Page 663 
This case is not like any we have heretofore decided concerning fraternal orders or benefit societies. The law of this State was amended by Acts of 1899, ch. 54, so as to exempt such bodies from the operation of our general insurance law and to put them in a class by themselves, at least in many respects. The certificates in Williams v. Order of Heptasophs,172 N.C. 787, was issued to the plaintiff 3 January, 1899, before the passage of the act of 1899, and that in Wilson v. Order of Heptasophs174 N.C. 628, was issued in the year 1896, while the certificates in this case were issued in the years 1901 and 1902, and is, therefore, governed by the act of 1899, so far as our law is applicable to the case at all.
The writer of this opinion concurred in those two cases for the reason that, in his opinion, this Court had previously decided the question involved in a series of cases; and when the Williams and Wilson cases were before us, it had been well settled that the law of this State should control our decision under the statute as it then existed. But the changes in the statute applicable to this case, as evidenced by the act of 1899, present the question to us again in a very different light. The amendments of 1899 plainly reveal that the Legislature had come to the view that fraternal and assessment orders should be governed by their own laws, rules and regulations, as authorized by the State of their origin, except where inconsistent with our laws concerning such orders. We find nothing in those laws that prohibit raising the rates of assessment, as was done by the defendant in 1916.
This Court, in Brenizer v. Royal Arcanum, 141 N.C. 409, recognized this change in our law, and especially that such orders had been excepted from the provisions of our general insurance law, among which is found the section requiring that "all contracts of insurance" shall be subject to the laws of this State when the contract is made or the application for the insurance is taken therein. This provision is, therefore, not applicable to benefit societies; and this appears more clearly when we consider Revisal, sec. 4791, which requires that certificates of fraternal orders shall be drawn in accordance with the charter and by-laws of the society or corporation.
The manifest object of these provisions was to make contracts of fraternal orders uniform, so as to preserve that equality and fraternity which is the basic principle of such orders. The Legislature saw clearly that it would be destructive of the life of the order unless members, for instance, were assessed according to one and the same rule, instead of the assessments being laid in each State according to (625) its own rule, which, moreover, would produce an undue and unjust proportion of the burden as between the members, there being as *Page 664 
many different assessments as there are States. The affairs of the order could not be administered under any such scheme, as some members would not be willing, of course, to pay a greater assessment than others who derived the same benefit.
As we hold that there is no statute of this State which prohibited the increase of the assessment in 1916, the case is brought directly within the ruling of the Supreme Court of the United States when deciding a similar case in Supreme Council of the Royal Arcanum v. Green, 237 U.S. 531, where the question is exhaustively treated by Chief Justice White, the Court assuming jurisdiction of the case upon the ground that the Court of Appeals of New York, from which the case was brought by writ of error, had not given full faith and credit, as required by the Constitution of the United States, Art. IV, sec. 1, to the acts, records, and judicial proceedings of Massachusetts, the validity of an assessment similar to the one made in 1916 being the question in that case. As the decision covers fully the point raised here, it will not be amiss to quote entensively from it, in order to show its broad scope, and how exactly and conclusively it decides every essential issue of law in this case, the facts of the two cases being substantially the same. Chief Justice White said there:
"It is not disputable that the corporation was exclusively of a fraternal and beneficiary character, and that all the rights of the complainant concerning the assessment to be paid to provide for the Widows, and Orphans' Benefit Fund had their source in the constitution and by-laws and therefore, their validty [validity] could be alone ascertained by a consideration of the constitution and by-laws. This being true, it necessarily follows that resort to the constitution and by-laws was essential unless it can be said that the rights in controversy were to be fixed by disregarding the source from which they arose and by putting out of view the only consideration by which their scope could be ascertained. Moreover, as the character was a Massachusetts charter, and the constitution and by-laws were a part thereof, adopted in Massachusetts, having no other sanction than the laws of that State, is follows by the same token that those laws were integrally and necessarily the criterion to be resorted to for the purpose of ascertaining the significance of the constitution and by-laws. Indeed, the accuracy of this conclusion is irresistibly manifested by considering the intrinsic relation between each and all the members concerning their duty to pay assessments and the resulting indivisible unity between them in the fund from which their rights were to be enjoyed. The contradiction in terms is apparent which would rise from holding on the one hand (626) that there was a collective and unified standard of duty and *Page 665 
obligation on the part of the members themselves and the corporation, and saying on the other hand that the duty of the members was to be tested isolatedly and individually by resorting not to one source of authority applicable to all, but by applying many divergent, variable and conflicting criteria. In fact, their destructive effect has long since been recognized.Gaines v. Supreme Council of the Royal Arcanum, 140 Fed., 948; RoyalArcanum v. Bradshears, 89 Md. 624. And from this it is certain that when reduced to their last analysis, the contentions relied upon, in effect, destroy the rights which they are advanced to support, since an assessment which was one thing in one State and another in another, and a fund which was distributed by one rule in one State and by a different rule somewhere else, would in practical effect amount to no assessment and no substantial sum to be distributed.
"It was doubtless not only a recognition of the inherent unsoundness of the proposition here relied upon, but the manifest impossibility of its enforcement which led courts of last resort of so many States in passing of questions involving the general authority of fraternal associations and their duties as to subjects of a general character concerning all their members to recognize the charter of the corporation, and the laws of the State under which it was granted, as the test and measure to be applied.Supreme Lodge, etc., v. Hines, 82 Conn. 315; Supreme Colony v. Towne,87 Conn. 644; Palmer v. Welch, 132 Ill. 141; Grime v. Grime, 198 Ill. 265;American Legion of Honor v. Green, 71 Md. 263; Royal Arcanum v.Bradshears, 89 Md. 624; Golden Cross v. Merrick, 165 Mass. 421; Gibson v.United Friends, 168 Mass. 391; Larkin v. Knights of Columbus,188 Mass. 22; Supreme Lodge v. Nairn, 60 Mich. 44; Tepper v. Royal Arcanum,59 N.J. Eq. 321; S. c., 61 N.J. Eq., 638; Bookover v. Life Asso.,77 Va. 85."
And, after referring to the principle and the cases cited to support it, the Chief Justice further says: "In fact, while dealing with various forms of controversy, in substance all these cases come at last to the principle so admirably stated by Chief Justice Marshall more than a hundred years ago(Head v. Providence Insurance Co., 2 Cranch, 127 167) as follows: Without ascribing to this body, which in its corporate capacity, is the mere creature of the act to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may correctly be said to be precisely what the incorporating act has made it, to derive all its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes. To this source of its being, then, we must recur to ascertain its powers.'"
This same rule as to the destructive effect of assessments in (627) different amounts is also stated in Royal Arcanum v. Brashears. *Page 666 89 Md. 624, as follows: "In a purely mutual association like the Royal Arcanum all members must be treated alike, for it would be destructive of the mutuality itself of the association if in suits against it the benefit certificate issued to a citizen of one State should be entitled to a more favorable construction than a similar certificate issued to a citizen of another State."
But, as we have seen, the Supreme Court of the United States has regarded the question involved as a Federal one, as it calls for the construction and application of Article 4, sec. 1, of the Constitution, and its decision upon the question is authoritative, and therefore binding upon us, even if we differed from its conclusion, which we do not. This being the case, it concerns us now to ascertain what is the law of Massachusetts in regard to this question. The defendant, in order to show what this law is, has introduced statutes of that State, a duly certified copy of the judgment roll of the highest court of that State, the Supreme Judicial Court, in Reynolds v. The Royal Arcanum, which is reported in192 Mass. 150. It also introduced the testimony of two eminent and learned members of the bar of that State, and from all this evidence, it appears to have been held by the highest court of Massachusetts, which has continued as the law of that State to this day, as follows:
1. The Royal Arcanum (and other fraternal beneficiary societies as well) have the power to increase their rates.
2. They have not only the right and power to increase their rates, but to put the members upon a new and increased table of rates, which are fixed as of the ages attained by the members, at the time the new scale of rates was adopted.
It will be proper here to state substantially, and as briefly as possible, what was said by the Court in the Reynolds case, using for the most part its own language: "The assessments to be paid for death benefits in this case are provided for by the by-laws, while a promise in writing to pay a certain sum to a particular person is, as to that person, a matter outside of those corporate rules which may be expected to be changed by an amendment of the by-laws. This promise on one side is set over against the promise of the member on the other. The promise of the member is to do what may be called for by the by-laws then existing or that may afterwards be adopted. The promise of the corporation is stated expressly, without mention of the by-laws. The member occupied a dual position, as an insurer and the insured. As one of the association agreeing to provide for the payments that may become due to members, he agrees to be subject to the by-laws. As the insured person to whom a particular sum of money is promised, he has *Page 667 
a right to stand on the terms of the promise. That the duties of members prescribed by the by-laws remain subject to modification (628) when a power of amendment is reserved has often been decided," citing Loeffler v. Modern Woodmen, 100 Wis. 79, and other cases.
"Most of the cases relied on by the plaintiffs, when rightly analyzed, turn on the distinction between an attempted amendment of the bylaws directly affecting the promise to the certificate holder as an insured person and an amendment affecting his duties as a member of the corporation bound to perform his part in providing means or otherwise as one of the association of insurers," citing Hale v. Equitable Aid Union, 168 Penn. St., 377, and many other cases.
"On principle and on the weight of authority, we are of opinion that there is nothing in this contract that prevents the corporation from amending its by-laws in a reasonable way, to accomplish the purposes for which it was organized, even though the change increases the payments to be made by certificate holders. Such changes necessarily involve some hardship to certain individual members, but the corporation, under the law, should do that which will bring the greatest good to the greatest number. The members who complain of its action are those who have had the benefit of insurance for themselves and their families for many years, at very much less than the cost of their insurance to the corporation. They have had the good fortune to survive, and therefore their contracts have brought them no money, but all the time they have had the stipulated security against risk of death. If now they are called upon to pay for future insurance no more than its cost to the corporation, they ought not to think it unjust."
The Reynolds decision was made, it is true, upon the raise of the rates in 1905 by the Royal Arcanum, but saving the date of the increase and the amounts, the question involved there as to the increase of the rates in 1905 is identical with that in this case, and, at least, in substance and in principle. There is no difference in law between the two, and a decision upon the one is directly applicable to a case arising upon the other. There is no difference between the Reynolds case and this one, which favors our present decision, and that is that while the laws of Massachusetts in 1905 permitted benefit societies to raise their rates above the existing level, in the same manner as was done in this case, the law in 1916 commanded that it should be done when necessary to meet its financial obligations. One was permissive merely, while the other was mandatory, and the latter was passed because it was apparent that the order could not be kept afloat in any other way.
It comes to this, therefore, that the highest Federal Court has declared that, under Article 4, sec. 1, of the Constitution, the question *Page 668 
must be determined by the law of Massachusetts to which courts (629) in other States must give full faith and credit, and we have shown that the law of that State not only permits but requires that the rates shall be increased when the necessities of the order demand it. This is not unfair or unjust to any member. If it were not the law, the order could not long survive or remain a going concern, because it must soon perish for the want of sustenance, and if this should happen, the certificates, of course, would be of no value; and, instead of being what it was intended to be, a society for the protection of its beneficiaries against loss in the case of death of its members, under a cheap or inexpensive form of insurance, it would prove to be an expensive and uncertain from of insurance to them. The very nature of the enterprise shows the absolute necessity for having a fixed and uniform rate of assessment, with power to raise it to a higher level when the exigencies of the society require this to be done. The Green case was approved in Supreme Lodge Knights of Pythias v. Mimms,241 U.S. 574 (60 L.Ed., 1179), where the rate of assessment was increased from $7.35 to $34.80, and justified under similar laws to those existing in the order of the Royal Arcanum in 1905 and 1916. See, also, Knightsof Pythias v. Smyth, 38 Sup. Ct., 210.
The Reynolds case has been approved by the Supreme Judicial Court of Massachusetts in the following cases: Hickey v. Baine, 195 Mass. 446, at p. 452; Proctor v. United Order Golden Star, 203 Mass. 587, at p. 590;Attorney General v. American Legion of Honor, 206 Mass. 158, at p. 164;Ulman v. Golden Cross, 220 Mass. 442, at p. 427. These cases were decided between 15 May, 1907, and 1 March, 1915, both dates inclusive, so that they continue the law of that State, as we have stated it, down to a day since the commencement of this action, and one of the Assistant Attorney-Generals of Massachusetts having special charge of the insurance department's matter states that it was the law when he testified.
It may be well to state briefly the history of the case of Green v.Royal Arcanum, supra, in order to show how identical are the contentions of plaintiff in that case with those of the plaintiff in this case: Sometime after the raise in 1905, one Samuel Green brought an action against the Royal Arcanum in the Supreme Court of New York to enjoin the defendant from suspending him for failure to pay the new rates. In the lower court, the judge upheld Green's contention and enjoined the defendant from suspending Green on account of his failure to pay the new and increased rates adopted in 1905. In concluding the opinion (124 N.Y. Supp., 398), the Court said: "I also hold that although the defendant is a Massachusetts corporation, still, when it *Page 669 
comes into the State of New York, conducting business here under the supervision and permission of the State insurance department, contracts made here with residents of this State in councils (630) organized and existing in this State and to be performed here are to be interpreted under the laws of the State of New York."
Upon appeal by defendant, the Appellate Division of the New York Supreme Court reversed the lower court, and held that the increase in rates in 1905 was valid (see 129 N.Y. Sup., 791). Thereupon Green appealed to the New York Court of Appeals and the Court of Appeals reversed the ruling of the Appellate Division and affirmed the ruling of the lower court,206 N.Y., 591. In this opinion the New York Court of Appeals held three main propositions:
(1) That the reservation in the benefit certificate to the effect that the member should comply with all laws, etc., made in the future, did not authorize the Royal Arcanum to increase the rates of assessment in 1905.
(2) That plaintiff's contract rights are not affected by the fact that defendant is a Massachusetts corporation, because the contract was made in New York, and is to be controlled by the laws of New York.
(3) That the statutes of Massachusetts did not authorize the change made in 1905, because the change impaired plaintiff's vested rights, which the Massachusetts statute forbade.
After the adverse decision of the Court of Appeals of New York the Royal Arcanum sued out a writ of error from the Supreme Court of the United States upon the ground that that decision was violative of section 1, article 4, of the United States Constitution, in that it failed to give full faith and credit to the public acts and judicial proceedings of the State of Massachusetts. It was therefore required of the United States Supreme Court to decide whether the highest court in New York erred in holding that the contract rights of the parties under the benefit certificate were to be determined by the laws of New York or by the laws of Massachusetts, when the Royal Arcanum was chartered; secondly, whether the Massachusetts law authorized the Royal Arcanum to raise the rates in the manner in which they were raised in 1905. The United States Supreme Court clearly and emphatically held:
(1) That the New York Court erred in determining the rights and powers of the defendant by the New York law, and that the question of the power to raise the rates as raised in 1905 must, under article 4, section 1, of the Federal Constitution, be determined by the laws of Massachusetts.
(2) That the statutes of Massachusetts, particularly in the light of theReynolds case construing those statutes, left no room for doubt that *Page 670 
the Massachusetts law governing fraternal beneficiary societies, did authorize the raise in rates made in 1905.
In the Mims case, supra, it was claimed that the society had demanded monthly dues in excess of its rights, and that the (631) amendments to the by-laws increasing the rates of assessment were Ultra vires and void. The by-laws governing the certificate, and enacted in 1884, provided that "each member of the endowment rank should continue to pay the same amount each month thereafter so long as he remained a member." In 1910, the by-laws were again amended so as to increase the plaintiff's monthly payments from $7.35 to $34.80, and required each member to pay as of his age attained in that year.
Justice Holmes, writing for unanimous Court in that case, said: "Persons who join institutions of this sort are not dealing at arm's length with a stranger whose mode of providing for payment does not concern them, but only his promise to pay. They are joining a club the members of which have to pay any benefit that any member can receive. The corporation is simply the machine for collection and distribution. Its charter expressly provides by section 5 that it `shall not engage in any business for gain; the purpose of said corporation being fraternal and benevolent.' It is manifest, therefore, that it would be a perversion of its purposes if, through some ambiguity of phrase, the necessary course of benefits were closed in favor of certain members, while their right to insist upon payment remained. The essence of the arrangement was that the members took the risk of events, and if the assessments levied at a certain time were in sufficient to pay a benefit of a certain amount, whether from diminution of members or any other causes, either they must pay more or the beneficiary less. The only language in the certificate bearing on the matter pointed to possible changes, one condition being the payment of all monthly payments `as required.' It was obvious and understood that, to pay a benefit, an increase in the assessment might be necessary. In our opinion the present charter, like the first, must be construed to authorize such an increase, and the clause in the law of 1884, relied upon, that the payments should continue the same so long as the membership continued, was not a contract, but was a regulation subject to the possibility inherent in the case. More than ambiguous words in an amendable law would be needed to establish a departure from the ground on which the relation of the parties obviously stood, and to create a privilege that attacked the corporation in its very life. . . . It is necessary to discuss the options that were offered in the alternative, but it is proper to remember that for many years the plaintiff had been insured, and although by what he *Page 671 
is not likely to regard as bad fortune, his beneficiary has not profited by it, she would have if he had died. As he happily lived, he has to bear the burdens incident to the nature of the enterprise into which he went open-eyed."
The same legislation was under consideration by the Supreme Court of the United States in the Smyth case, supra. In that case, at the time the member's certificate was delivered to him, he was also provided with a copy of the constitution and laws, which contained, (632) among other things, in article 4, this provision: "Each member . . . shall pay . . . a monthly assessment, as provided in the following table, and shall continue to pay the same amount hereafter as long as he remains a member of the Endowment Rank." Smyth originally paid a monthly assessment of $3 until 1894, when it was increased to $3.15, which he paid until 1901, when it was increased to $4.80, which he paid until 1910, when he received a notice of increase to $14.70. The decision of the case turned, as was said by the district judge (108 Fed., 963), on the power of the supreme lodge to increase the monthly payment of assessments from $4.80 to $14.70 per month. It appeared in the record that, at the time the increase of 1910 went into effect, a circular was delivered to the plaintiff saying: "These payments do not increase (the words `do not increase' italicized) with increasing age, but always remain the same during the good standing of the member." 198 Fed., 990.
The United States Supreme Court called attention to article 4, above set forth, and said: "This provision, it is contended, because a part of the contract of insurance with the plaintiff, which could not be changed without his consent, and made unlawful any increase in his assessment. The defense is that power was given to the defendant by its charter to change its by-laws; that by provisions in his policy and his application for it, the plaintiff was notified and charged with knowledge of this fact; and that the increase of assessment complained of was duly authorized pursuant to the terms of this grant of power." The Court held that the Smyth case was on all fours with the Mims case, and that the decision in that the case must be accepted as controlling on the merits and decisive of the authority of the supreme lodge to increase the monthly assessment rates.
It should be noted, as important in the consideration of our case, whatJustice Holmes says in the Mims case, supra, viz., that the clause providing for periodical payments of the same amount "so long as the membership continued, was not a contract, but was a regulation subject to the possibility inherent in the case, and that any other view of it would create a privilege which would attack the corporation in its very life." This is the crux of the whole matter, and the vital principle of *Page 672 
the case, crisply stated and sharply and lucidly denied. The Chief Justice
thus concludes the opinion of the Court in Royal Arcanum v. Green, in regard to the effect of the Massachusetts law and its application to cases in other States:
"Coming, then, to give full faith and credit to the Massachusetts charter of the corporation and to the laws of that State to determine the powers of the corporation and the rights and duties of its members, there is no room for doubt that the amendment to the by-laws (633) was valid if we accept, as we do, the significance of the charter and of the Massachusetts law applicable to it as announced by the Supreme Judicial Court of Massachusetts in the Reynolds case. And this conclusion does not require us to consider whether the judgmentper se as between the parties was not conclusive in view of the fact that the corporation for the purposes of the controversy as to assessments was the representative of the members. (See Hartford LifeInsurance Co. v. Ibs, this day decided.) Into that subject, however, we do not enter."
There is another ground of distinction between the Strauss, Williams, and Wilson cases, and the other cases cited in them, on the one hand, and our case, on the other. In the former, there was not only a rising to a higher figure of the rates, but there also was classification and discrimination. That is, the old members were put in one class and the new members in another, and the losses (death benefits) in the old class were paid from the funds collected from that class, while the losses in the new class were paid from the funds collected from that class; but in this case it appears that all moneys collected from assessments are mingled or blended in one fund, and losses paid solely out of it. It is, therefore, a single or common fund for the payment of death benefits. In the one case there is classification and discrimination, while in the other, there is neither. This burden put upon the old class of payings its own death benefits, while an advantage is given to the new class, which increases in number, caused the Chief Justice to say in Williams v. Heptasophs, supra:
"This is not the case of an increase of assessments, but it is a discrimination between members," resulting of course, from unfair and unjust classification.
In Wilson v. Order of Heptasophs, 174 N.C. at p. 628, the Chief Justice, comparing this process of classification to the flow of a river, says: "The loss in volume by the outflow is constantly made good by accessions along the route, i. e., by the interest accruing, and by the waters coming from above, i. e., the payments by new members. While time depletes the current by death, it is adding to it from new sources; but when, as in this case, the company seeks to divide its members into *Page 673 
classes, the older of which will receive no accessions, the current will soon run dry. It is true that this figure is more applicable to the standard companies than to a benefit association when the losses are paid by assessments upon death, but it is none the less true that when there is a class in which there are no new members to assess, that class must become smaller and smaller and the assessments larger and larger until they become unbearable."
And in the Williams case, 172 N.C. at p. 789, he demonstrates the baneful effect upon the older members in the application of this classification when he says: "Under this system the assessments upon the plaintiff became, of course, much higher than if the entire (634) membership had continued to share in the burden of all the deaths, with the result that if the plaintiff was the longest liver in that class he would have to pay his own death loss, and in the meantime would, as a member of a constantly dwindling class, have been required to pay higher and higher assessments on the death of each of his fellow-members."
We have no such case here, as the law wisely provides for a common fund, to which the Chief Justice favorably referred, in those cases, and from this one source all are paid alike. It was held in Supreme Council RoyalArcanum v. Bradshears, 73 Am. St. (Md.), 244, that in a purely mutual association like the Royal Arcanum, all members must be treated alike, for it would be destructive of the mutuality itself of the association if in suits against it the benefit certificate issued to a citizen of one State should be entitled to a more favorable construction than a similar certificate issued to the citizen of another State. And also, in the same case, it is said to be well settled that the contract of membership in a mutual association is always made with reference to and includes the constitution and by-laws of the association, whether they are specially referred to in the contract or not citing cases and 3 Am. Eng. Enc. (2 Ed.), 1081; Yoe v. Howard Assn., 63 Md. 86; Fuller v. Baltimore Assn.,67 Md. 433.
The plaintiff cannot say that he has borne "the heat and burden of the day." and therefore his case should be favorably considered, for he has not. He has been given insurance at less than its normal cost and at a much cheaper rate than it could have been secured by the ordinary life plan, and he will continue it, under the increased rate, at a stated sum which is not in excess of its cost to the order for member of his age. He, therefore, has no reasons for complaint against the law, because if it seems to be harsh, it is in reality not so.
But plaintiff alleges that he was fraudulently induced to join the order by its agent, who falsely represented that the rate would continue *Page 674 
to be the same so long as he was a member. He tendered two issues based upon this allegation which the judge rejected, as a false representation which induces another to act is not necessarily or even ordinarily fraudulent. The representation, though false, may have been honestly made in the belief that it was true, and it may have caused plaintiff to become a member without having been intended to deceive him. When we consider the facts and the language of the certificate and other documents to which plaintiff had easy access, it was more the expression of an opinion or the legal construction of words than a falsehood which was calculated and intended to willfully mislead; nor was there any trick or artifice employed to prevent a full and free inquiry, and besides, and what is more conclusive against the charge of (635) fraud is the fact that language was used in the papers which expressed, or at least implied, what was affirmed by the agent, that the assessment would remain the same so long as he remained a member of the order. The language is: "Every applicant. . shall pay . . . the following named amounts (set forth in the table) . . . according to the age attained . . . and the same amount on each assessment thereafter whilst he is a member of the order, unless he should have changed his rate."
The plaintiff had the necessary documents for informing himself and as much intelligence as the agent, so it appears, for understanding them. He soon became the regent or head officer of his local council and must be presumed to have ascertained what were the constitution, bylaws, rules and regulations of the order, if he properly performed his duty, and he continued to be a member, to pay the amount of his assessments, and to accept and enjoy the highest honor of the order for some years without complaint or protest.
There are other important facts which relieve the agent of imputation of fraud, but it is unnecessary to recite them, as those already stated will suffice to show that the charge of fraud is without any real foundation. We will, therefore, content ourselves with a reference to a few of the precedents applicable to such cases. The following, relied on by the plaintiff, are not in point: Caldwell v. Ins. Co., 149 N.C. 100; Sykes v.Ins. Co., 148 N.C. 13, and Whitehurst v. Ins. Co., 149 N.C. 273. In each of those cases the agent of the company took advantage of the ignorance and illiteracy of the applicant and deceived him as to the language and meaning of the policy when he well knew that the applicant could not read and could not understand. This case is like those of Cathcart v. Ins. Co.,144 N.C. 623; Clements v. Ins. Co., 155 N.C. 57, and Wilson v. Ins. Co.,id., 173. Those cases are very much like this one and sufficiently so in principle to control it. *Page 675 
In Tarault v. Seip, 158 N.C. at p. 370, the Court said: "Nor can fraud exist where the intent to deceive does not exist, for it is emphatically an action of the mind that gives it existence. It is not sufficient that the representations are false in point of fact; the defendant must be guilty of a moral falsehood. The party making the representation must know or believe it to be false, or, what is the same thing, have no reason to believe it to be true. The action for fraud and deceit rests in the intention with which the representation is made and not upon the representation alone," citingEtheridge v. Palin, 72 N.C. 213; Tilghman v. West, 43 N.C. 183; Hamrick v.Hogg, 12 N.C. 350, to which we add Cash Register v. Townsend, 137 N.C. 652;Unitype Co. v. Ashcraft, 155 N.C. 63.
It was said in Floars v. Ins. Co., 144 N.C. at p. 232: "While these principles are very generally admitted, it is also accepted doctrine that when the parties have bargained together a contract (636) of insurance, and reached an agreement, and in carrying out or in the effort to carry out the agreement a formal written policy is delivered and accepted, the written policy, while it remains unaltered, will constitute the contract between the parties, and all prior parol agreements will be merged in the written instruments; nor will evidence be received of prior parol inducements and assurances to contradict or vary the written policy while it so stands as embodying the contract between the parties."
And in Bland v. Harvester Co., 169 N.C. 418, we said: "The plaintiff relies entirely upon certain alleged verbal representations made to him by a sales agent of the defendant. In a late case this Court said that parties to the contract are `not only held to the terms of the contract deliberately entered into, but are not permitted to contradict or vary its terms by parol evidence, as the `written words abides' and must be considered as the only standard by which to measure the obligation of the respective parties to the agreement in the absence of fraud or mistake.'" See, also, Guano Co. v. Live Stock Co., 168 N.C. 447.
In Mowry v. Insurance Co., 96 U.S. 54, where plaintiff alleged that the agent of the company had allured him into accepting a policy by a tempting bait, the Court said: "The previous representation of the agent could in no respect operate as an estoppel against the company. Apart from the circumstances that the policy subsequently issued alone expressed its contract, an estoppel from the representations of a party can seldom arise, except where the representation relates to a matter of fact, to a present or past state of things. If the representation relate to something to be afterwards brought into existence, it will *Page 676 
amount only to a declaration of intention or of opinion, liable to modification or abandonment upon a change of circumstances of which neither party can have any certain knowledge."
And again, upon the same question, and answering the contention of the agent's fraud, the Court said in the same case: "But to this position there is an obvious and complete answer. All previous verbal arrangements were emerged in the written agreement. The understanding of the parties as to the amount of the insurance, the conditions upon which it should be payable, and the premium to be paid, were there expressed for the very purpose of avoiding any controversy or question respecting them. The entire engagement of the parties, with all the conditions upon which its fulfillment could be claimed must be conclusively presumed to be there stated. If by inadvertence or mistake provisions other than those intended were inserted or stipulated provisions were omitted, the parties could have had recourse for a correction of the agreement to a court of equity, which is competent to (637) give all needful relief in such cases. But until thus corrected, the policy must be taken as expressing the final understanding of the assured and of the insurance company."
As to the duty of a member of read his certificate, the Court said inFraternities Acci. Order v. Armstrong, 106 Va. 746: "A person who becomes a member of such a society or order must acquaint himself with its by-laws, for they, to the extent of their provisions, measure his duties, his rights and his liabilities. He is chargeable with knowledge of the general nature and character of the organization which he is joining, and of its rules and regulations. The member of such a corporation being bound by the provisions of its by-laws, such by-laws enter into and form part of the contract as between the member and the company, whether formally incorporated in the contract or not. . . The law conclusively presumes that those who become members of such a society have acquainted themselves with its by-laws."
And upon the same question it was said in Upton v. Tribilcock, 91 U.S. at p. 45: "That the defendant did not read the charter and bylaws, if such were the fact, was his own fault. It will not do for a man to enter into a contract, and when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they were written. But such is not the law. A contractor must stand by the words of his contract, and if he will not read what he signs he alone is responsible for his omission," citing Jackson v. Croy, 12 Johns., 427; Leisv. Stubbs, 6 Watts., 48; Farly v. Bryant, 32 Me. 474; Coffing v. Taylor,16 Ill. 457; Slafyton v. Scott, 13 Ves. 427; Alvanly v. Kinnard, 2 Mac. G., 7; 29 Beav., 490. The *Page 677 
case of Gwaltney v. Ins. Co., 132 N.C. 925, on which plaintiff relies is not at all applicable.
In the course of the opinion he wrote for the Court in Cathcart v. Ins.Co., 144 N.C. 623, which we have cited as ruling our cases, Chief JusticeClark says of the Gwaltney case; This case (Cathcart v. Ins. Co.) is rather like Floars v. Ins. Co., 144 N.C. 232, where it was held that a failure to read the policy or examine it for three months is a waiver of any right to reform the policy on the ground of mistake," and this applies, of course, to other equitable relief.
We close this branch of the case with what is said in Clements v. Ins.Co., 155 N.C. at p. 61 and 62: "The loss of the plaintiff, if any he has sustained, is directly and wholly attributable to gross neglect of his own interests and to his supineness when he should have been active and vigilant. Equity will not assist one whose condition is traceable only to that want of diligence which may fairly be expected from a reasonable and prudent person, and even when he is watchful and discovers a wrong practiced upon him, a court of equity requires (638) that he should be prompt in asserting his claim to relief against it, for it will not aid those who sleep on their rights, but only those who are vigilant."
Justice Holmes said in Supreme Lodge of Knights of Pythias v. Mims,241 U.S. 571, already cited, that the provision as to the permanency of the rate charged at entrance of a member is but a rule or regulation, subject to change as the necessities of the order might require. If plaintiff had bestowed even slight care upon his interests and informed himself when he had ample opportunity to do so, he would have discovered what was the meaning of the clause as to rates. It is too late, after so many years have elapsed, even if there was any fraud or mistake, to ask for relief at the hands of a court of equity.
There are some objections to evidence, but they relate to the documentary and other proof showing the law of Massachusetts, and really go to its legal effect, rather than to its competency and relevancy.
We have shown why the issues tendered by the plaintiff should not have been submitted.
We consider the Green case, supra, as decisive of ths [the] one on the two main and essential questions, that under the full faith and credit clause of the Constitution, the applicable law is that of the State of Massachusetts, and that under the law, of itself, and certainly as construed by its highest court, the increase by the assessments was fully warranted. *Page 678 
There was no real dispute about the material facts, and upon them plaintiff has no cause of action, and therefore the judgment of the Court is correct.
No error.
Cited: Pittman v. Tobacco Growers Association, 187 N.C. 342; McNeal v.Insurance Co., 192 N.C. 451; Finance Company v. McGaskill, 192 N.C. 559;Stone v. Milling Co., 192 N.C. 585; Burton v. Insurance Co., 198 N.C. 501;Small v. Dorsett, 223 N.C. 760.
(639)