(No. 19916.

EDWARD W. JENKINS *et al.* Appellants, *vs.* ADOLPHUS R. TALBOT *et al.* Appellees.

*Opinion filed February 21, 1930—Rehearing denied April 2, 1930.*

442

TOLMAN, SEXTON & CHANDLER, JOHNSON & PEFFERLE, JOHN R. DONOHUE, SANDEN, ANDERSON, LAUGHLIN & GRADWOHL, FOSTER E. KING, CHARLES B. PERRY, R. G. HEPWORTH, RICHARD K. PHELPS, WILLIAM A. ANDERSON, and J. C. McREYNOLDS, (EDGAR BRONSON TOLMAN, of counsel,) for appellants.

GEORGE G. PERRIN, NELSON C. PRATT, and POPPEN-
HUSEN, JOHNSTON, THOMPSON & COLE, (FLOYD E. THOMP-
SON, of counsel,) for appellees.

ARTHUR W. FULTON, and GEORGE R. ALLEN, for the
National Fraternal Congress of America, *amicus curiæ*.

Mr. JUSTICE STONE delivered the opinion of the court:

This appeal is from a decree of the circuit court of
Cook county which dismissed the appellants' bill of com-
plaint for want of equity. The object of the bill was to
enjoin the defendants from enforcing certain changes in
the by-laws of the Modern Woodmen of America, consti-
tuting a re-adjustment of its plan of operation as a fra-
ternal beneficiary society organized under the laws of this
State. The cause was heard on bill and answer, and there
is therefore no disagreement about any question of fact.

The Modern Woodmen of America was organized in
1883 and incorporated in 1884. The corporation is a de-
fendant to the bill and the individual defendants are its
executive officers and directors, who compose its executive
council. The head banker is also a defendant though not
a member of the executive council. The object for which
the society is organized is not for profit but to promote fra-
ternal relations among its members and furnish life in-
demnity or pecuniary benefits to persons or institutions in
the event of death or of accident, as permitted by the laws
of the State and of the society. The society has subordi-
nate bodies called "camps" in forty-six States of the United
States and four provinces of Canada. Its supreme govern-
ing and law-making power is the head camp, composed of
officers and representatives elected by the members, which
meets every four years and has jurisdiction over the sub-
ordinate camps and officers and members of the society.

The complainants in the original bill are Edward W.
Jenkins, William H. Taylor, John Brauninger, Thomas

Purviance and John W. Upchurch, who have been members of the society from twenty-three to thirty-four years and whose ages are from fifty-seven to seventy-one years. Each is the holder of a certificate for $2000 except Purviance, whose certificate is for $3000. An intervening bill joining in the prayer of the original bill was filed by leave of the court by Beatrice Camp No. 270 of the Modern Woodmen of America of Beatrice, Nebraska, D. C. Rambo, George W. Gamble, Edward McAlister, John William McKissick and Carl E. McAlister. The individual intervening complainants have been members of the society from two to thirty-six years, their ages being from twenty-three to seventy-four years, and have certificates for $1000 or $2000 each. Walter S. Canfield and D. W. Wright also filed an intervening bill by leave of the court, joining in the prayer of the original bill. The bill is filed and relief is prayed on behalf of the complainants named and of all other members of the society similarly situated.

The answer sets out the facts in the history of the order which are relied upon as justifying and requiring the changes in the by-laws made at the meeting of the head camp in June, 1929, constituting the plan of re-adjustment which is the subject matter of the present litigation. Originally the articles of association provided that the funds for the ordinary expenses of business should be raised by assessments on the members, thus creating a general fund, and the funds for the payment of death losses from assessments of surviving members, which should constitute the benefit fund. This fund was to be collected from the surviving members of the fraternity by the proper officers of the local camps, forwarded to the head camp to be disbursed by its officers, and could be appropriated for no other purpose. By-laws were enacted for the payment of death benefits by the levy of an assessment upon the surviving members and its collection from them at rates fixed according to the respective ages of the members at the date

of entry into membership, as often as might be necessary to pay the agreed amount of benefits to the beneficiaries of deceased members. These provisions continued until June, 1917, when the head camp amended the articles of association by providing that the fund for the payment of death losses and permanent disability claims should be created and maintained by assessments on the members and by interest on or other accretions to said fund and should be known as the benefit fund, no part of which should be used for the payment of the expenses of the society; and that the head camp should have power to determine the number, regulate and fix the rate of assessments and their payment, create, maintain and disburse a reserve fund, and do all other acts by it deemed essential to the welfare and perpetuity of the society in conformity with the laws of the State of Illinois. At the same time the by-laws were amended by the adoption of section 100, providing that any member seventy years or more of age who had become disabled so that he could not perform the ordinary duties of life should be entitled to receive from the benefit fund a disability benefit equal to all beneficial assessments paid by him on account of the benefit certificate surrendered.

Upon the organization of the association a code of laws for its government and the management of its affairs was adopted, which has been amended and added to from time to time. Although the original articles of association provided that the benefit fund for the payment of death losses should be derived from assessments collected from surviving members, no such assessment was ever made. From three to twelve assessments a year were made from time to time and were enough to pay the death losses. The by-laws required every member, as soon as admitted, to deposit one benefit assessment and three months' general fund dues, and there were always sufficient funds to pay death losses without the levy of assessments on surviving members. Since 1912 a by-law has provided that for meeting

the mortuary liability a benefit assessment be levied for each calendar month upon each beneficial member, to be paid during the calendar month. The rate of assessment originally provided in the by-laws was thirty cents for each thousand dollars included in the beneficiary certificate for ages from eighteen to twenty years, thirty-five cents from twenty to twenty-four years, forty cents from twenty-four to twenty-eight years, and higher for greater ages. In 1885 these rates were changed, the rate for ages from eighteen to twenty-eight years being fixed at forty cents a thousand. In 1903 the rates were revised and substantially increased, requiring every beneficial member to pay after January 1, 1904, death benefit assessments, according to his age at the date of his certificate, of fifty cents for ages from eighteen to twenty-five years, fifty-five cents from twenty-six to twenty-seven years, sixty cents from twenty-eight to twenty-nine years, and at proportionally increased rates for greater ages. These rates continued in force until by the action of the head camp in June, 1919, in adopting a by-law designated as section 42, a new table of rates was created, effective July 1, 1919, which increased the rates from fifty to one hundred per cent, based upon the age of the member on his birthday nearest the date of his original certificate, as had been the case with previous tables of rates. Under this table the rates at ages of seventeen and eighteen years were seventy-five cents, increasing with greater age to two dollars at forty-five years, except that the rate for any member admitted before July 1, 1919, who was over thirty-seven years old at his birthday nearest the date of his original certificate, should be $1.50 for each $1000 instead of the rates provided for the ages from thirty-eight to forty-five years, inclusive. No provision was made in the by-laws for a reserve fund, but under these rates the assessments produced enough money to pay all the death losses as they accrued, and the society accumulated a surplus fund which in 1916 and 1917 was about ten million

dollars. From 1917 to 1919, by reason of the deaths of members during the World War and the greater number of deaths during the epidemic of influenza, this surplus was reduced in the year 1919 to about two million dollars. To meet this situation the society in 1917 established a patriotic fund, created by an assessment of twenty cents a month for each $1000 of insurance. Twenty-two of these assessments were levied and collected and their proceeds proved adequate to meet the war losses. This patriotic fund continued until July 1, 1919.

Under the new schedule of rates established in 1919 the surplus of the society, which had dwindled to $2,000,000, began again to accumulate and increased to $42,979,049 in 1927. Its membership increased from 1,027,304 in 1920 to 1,113,225 in 1928. On May 1, 1929, the total beneficial membership of the order was 1,086,067, of whom more than 420,000 had joined since July 1, 1919. The insurance in force May 1, 1929, amounted to $1,657,381,500. During May, 1929, 1345 death claims were paid to beneficiaries, amounting to $2,263,584.65. The total number of death claims paid since the organization of the society up to June 1, 1929, is 242,004, and their amount is $416,370,-202.67. The total number of seventy-year disability claims paid is 13,508, and their amount is $7,950,494.55. With the increase in the rates from fifty to one hundred per cent and the increase in the membership the society was able to meet the rapidly increasing death losses, to show an increase in its surplus fund, and even for the moment in 1921 a slight increase in its solvency. Since 1921, however, the surplus of receipts over disbursements has constantly decreased from $6,784,919.65 in that year to $737,-788.09 in 1927 and entirely disappeared in 1928, with a deficiency in that year of $932,608.24. In the first five months of 1929 there was a deficiency of $3,225,329.59. The following table shows the receipts and disbursements of the society during the years following 1919, the sur-

plus and deficit of receipts, and the proportion of assets to liabilities, or percentage of solvency, for each year. The receipts include the assessments collected from members and the interest earned on the invested funds of the society. The disbursements include death claims and seventy-year disability claims. In computing the proportion of assets to liabilities the assets include funds on hand and the present value of future payments under the table of rates in force prior to July 1, 1929, on the basis of twelve assessments a year, and liabilities include the present value of the insurance in force and accrued claims. This is the method of valuation prescribed in the statutes of most of the States and is accepted by the insurance departments of all States:

| Year | Receipts | Disbursements | Surplus or Deficit | | |
| --- | --- | --- | --- | --- | --- |
| 1920 | $23,883,116.84 | $17,316,814.08 | $6,565,302.76 | (s) | 55.94 |
| 1921 | 23,525,370.07 | 16,740,450.42 | 6,784,919.65 | (s) | 55.81 |
| 1922 | 23,030,208.40 | 18,364,627.10 | 4,665,581.30 | (s) | 55.84 |
| 1923 | 23,848,591.95 | 19,853,534.05 | 3,995,057.90 | (s) | 55.97 |
| 1924 | 24,145,792.40 | 20,085,819.30 | 4,059,973.10 | (s) | 55.89 |
| 1925 | 25,199,628.63 | 21,014,080.45 | 4,185,548.18 | (s) | 55.60 |
| 1926 | 25,269,153.75 | 23,600,717.96 | 1,668,435.79 | (s) | 55.26 |
| 1927 | 25,326,274.92 | 24,588,486.91 | 737,788.01 | (s) | 54.17 |
| 1928 | 25,202,021.71 | 26,134,629.95 | 932,608.24 | (d) | 51.95 |

During the first five months of 1929 the total receipts of the society from assessments and other sources for the payment of death claims and other benefits was $10,492,-583.46. The total death claims paid amounted to $13,747,-923.05. This leaves a deficiency for the five months from January 1, 1929, to June 1, 1929, of $3,255,329.59.

In 1919 the society was composed of several hundred thousand members, (650,000 still persisting in 1929,) all of whom were paying rates which with twelve assessments a year were wholly inadequate to pay at maturity their

certificates representing several hundred millions of dollars of insurance. No reserve fund had been created, as authorized by law. The amounts of assessments paid by members from the organization of the society had been returned to them or their beneficiaries in the payment of benefits according to the laws of the society except about $2,000,000, which was on hand not as a technical reserve fund but as a surplus of the benefit fund. A large proportion of the members had reached an age when a rapidly increasing number of certificates each year might be expected to mature by the death of such members, resulting in the inability of the society to meet their payments without increasing either the rate of assessment or the number of assessments. Accordingly the number of the assessments each year was left at twelve, as it had been for many years,—a number which had never been exceeded in any year,—and the rate to be paid by each member was increased from and after July 1, 1919, by from fifty to one hundred per cent. At the same time the same rates were made applicable to each member entering the society after July 1, 1919. The scale of rates so adopted was adequate so far as the new members were concerned, but it was inadequate so far as the old members were concerned because the previous rates at which the older members had been paying for thirty or forty years or more had not been high enough to permit the building up of reserves sufficient to meet the payments of their certificates as they became payable, and the members admitted before July 1, 1919, instead of being rated according to their attained ages on that date, were rated at the age indicated by their beneficiary certificates. This is the reason of the story told by the table from 1920 to 1928, just preceding this paragraph.

After operating for ten years in accordance with the 1919 re-adjustment, it was evident in 1929 that the method in which the business of the society had been conducted

up to that time and was then operating would eventually result in an inability to meet in full the payment of the benefits promised by its certificates, and this meant the ultimate failure and bankruptcy of the society. The plan of re-adjustment adopted in 1919 was insufficient to put the society on a sound basis and keep it there. The table of rates then adopted, it is conceded, was adequate, and the adoption of the plan would have made the society actuarially solvent had it been applied equally to the then existing and the subsequently admitted members of the society according to their ages on July 1, 1919, or subsequent date of admission. The statutes of most of the States relating to fraternal beneficiary societies doing business in the States require a report of the valuation of the certificates in force on December 31 in each year but do not require a showing of actuarial solvency. Actuarial solvency requires that the funds of the society on hand and the present value of future payments to be made by the members shall be equal to the accrued obligations and the present value of insurance in force. If a society has shown in any triennial report a deficiency in actuarial solvency it is required to show at least the same degree of actuarial solvency in subsequent triennial reports. It will be regarded, however, as legally solvent so long as the funds in its possession are equal to or in excess of its matured liabilities. The 1919 rates applied to every member according to his age at his birthday nearest to the date of his original certificate, and were of an amount which would have produced the sums required to pay all the certificates as they matured had they been in force throughout the existence of the society and been paid since. In such case these rates would have produced a reserve which, with its accretions and the payments subsequent to July 1, 1919, would have paid to each member's beneficiary, on his death, the full amount of his certificate. No such reserve, however, existed in 1919. The surplus had been reduced to the com-

paratively small amount of $2,000,000, and the amount applicable to each certificate was correspondingly small.

When the society began operation more than forty-five years ago the rate of assessment which the members were required to pay was wholly inadequate to enable the society to make good its certificates in respect to the amount to which the beneficiaries of its members should participate in the benefit fund. For some years assessments were made sufficient to pay the few death claims which arose, and from three to twelve assessments a year furnished ample revenue for the purpose. After a number of years, however, with the increased age of the members, the deaths became more numerous, and a monthly assessment was levied and required to be paid in each calendar month. The contract by each member with the society consists of his application for membership, the certificate issued to him, the by-laws of the society and the applicable laws of the State. In his application each member agreed to pay all assessments legally levied and to conform in all respects to the by-laws, rules and usages of the society at the time in force or afterward enacted or adopted. He further agreed that any and all changes, additions or amendments to the articles of association or to the by-laws of the society, made and adopted subsequent to the date of the application, should bind him and his beneficiary and should govern and control all rights of himself or his beneficiary, in all respects, in the same manner as if made prior to and in force at the time of making the application. The benefit certificate provides that the member, if he shall pay the benefit fund assessment in accordance with the provisions of the existing by-laws of the society, or as such by-laws may be changed, added to or amended, is, while in good standing, entitled to the privileges of the society, and his beneficiary shall, in case of his death while a beneficial member of the society in good standing, be entitled to participate in the benefit fund of the society to the amount stated in the cer-

tificate, without interest, to be paid to such beneficiary, provided that all the conditions and agreements contained in the member's application for beneficial membership and in the certificate and in the by-laws of the society, as such by-laws now exist or hereafter may be added to, modified, amended or enacted, shall be fully complied with.

The basis on which the rates of the Modern Woodmen were first fixed does not appear, but it does appear that the rates were inadequate to the undertakings of the society, which, having now been in operation forty-five years, has reached the age where a very large proportion of its members are old men. The statistics of the society, as shown by its table of mortality, show that from fifteen to fifty years of age the death rate is comparatively low and does not increase rapidly, being 3.46 in 1000 at fifteen and only 8.54 at the age of fifty, but between fifty and sixty the rate is more than doubled, and after sixty increases with still greater rapidity. On December 31, 1890, 94.72 per cent of the membership of the society were under fifty-one years of age and only 5.28 per cent above that age. On December 31, 1910, 87.3 per cent of the members were under fifty-one years and 12.7 per cent over that age. On December 31, 1919, 71.5 per cent of the society membership were under fifty-one years and 28.5 per cent over that age. On December 31, 1928, 61.1 per cent of the members were under fifty-one and 38.9 per cent over fifty-one. In 1901 the deaths of members over fifty years of age was 12.4 per cent of the total number of deaths. In 1910 it was 31.6 per cent, in 1918 it was 38.7 per cent, in 1928 it was 79.5 per cent. In 1921, 5489 members died at ages under sixty and 4036 at sixty and over. In 1928 there were 6005 deaths at ages under sixty, an increase of 516, while there were 8757 deaths at ages of sixty and over, an increase of 4721. On December 31, 1928, the defendant society was 51.95 per cent actuarially solvent. This means that by valuation the proportion of the assets to

the liabilities—that is, the present assets plus the present value of future payments to the present value of insurance in force and accrued liabilities—is 51.95 per cent. On December 31, 1928, the solvency by valuation of business written prior to 1919 was 35.42 per cent. On business written prior to 1919 there was insurance in force on December 31, 1928, of $1,121,919,000. The assessments paid in 1928 by this group were $18,060,011. The death losses were $23,243,500—a deficiency of $5,183,489.

At a meeting of the head camp held in June, 1929, amendments of the by-laws were adopted changing the provisions of section 42 as follows:

"Sec. 42. *Rates of assessments, mortuary contributions, valuation, reserves and cost of insurance.*—(A) Every beneficial member obtaining insurance after July 1, 1919, shall be liable for and shall pay for same, monthly assessments, to be determined by his age at his next birthday after the date of his benefit certificate providing for such insurance, according to the following rate tables applicable to the form of certificate issued to him: [Here follow tables of rates for whole life insurance for $1000 ordinary form (A) and other forms, and for term insurance ending at different ages. The rates for ordinary form (A) whole life insurance are identical with those in the table of 1919 for ages frcm seventeen to forty-five inclusive but are continued to the age of sixty, for which the rate is $4.50.]

"(B) A special fund is hereby established, designated reserve fund, into which shall be transferred by the board of directors from the benefit fund as of July 1, 1929, a sum equal to the level premium reserve based on the Modern Woodmen of America table of mortality and four per cent interest on all insurance in force on said date which became effective as new insurance subsequent to July 1, 1919, and immediately following each annual valuation as of December 31 of each calendar year, there shall be transferred from the benefit fund to the reserve fund

such sum as shall represent the accretion to reserves for the previous year upon all certificates for new insurance issued subsequent to said date. The reserve fund shall not be drawn upon for any purpose except withdrawal of reserves on individual certificates the reserves for which are included in this fund. Said reserve fund shall be maintained separate and distinct from other assets of the society in trust for and to be applied to the protection and payment of the sums agreed to be paid as expressed in certificates the reserves for which are included in said reserve fund. * * *

"(D) All certificates for new insurance issued subsequent to July 1, 1919, shall be valued on the net level premium basis, (subject to the provisions of these by-laws relating to general fund,) such valuation to be made annually as of December 31 and to be upon the standards of mortality and interest employed in the calculation of contribution rates. The required reserves as determined by such valuation shall be maintained at all times, and assets representing the same shall be carried in the reserve fund. Certificates issued after July 1, 1929, at attained age rates in exchange for prior issues surrendered or canceled, and certificates issued after said date for paid-up insurance as provided in paragraph (M) shall be deemed certificates for new insurance, and the reserves for such certificates shall be transferred to the reserve fund. * * *

"(H) Any member holding a certificate for new insurance issued subsequent to July 1, 1919, shall be entitled, upon reaching the age of seventy years, according to the date of birth given in the application, to receive disability benefits in the form of paid-up values or cash withdrawal in such amounts, not to exceed in value the reserve thereon, as the executive council shall determine. * * *

"(J) From and after July 1, 1929, all certificates in force issued for insurance that became effective prior to July 1, 1919, shall be valued, as to such insurance, on

the accumulation basis by crediting each such certificate holder with the apportioned credit, if any, created in paragraphs (K) and (L) and with the amount contributed by him on such insurance thereafter to the benefit fund, and with interest at approximately the net rate earned, and by charging each such certificate holder with his share of the death losses. The share of death losses chargeable as herein provided shall be the actual cost of insurance according to the experience of the society, taking into consideration the amount at risk, which shall be the amount of the death benefit less the existing credit. If at any time after December 31, 1929, any such certificate holder's share of losses exceeds his credit, his mortuary contribution or benefit fund payments thereafter for successive years shall be at the one-year term rate according to the Modern Woodmen of America mortality table set forth in section 43A of these by-laws based upon his attained age (according to his original application for membership) at nearest birthday on the first day of the calendar year. Any excess of costs over contribution and credits may be paid out of any available surplus as the board of directors may determine. All credits, charges and rates as herein provided shall be based upon the Modern Woodmen of America table of mortality. All payments of the member are to be on a monthly basis. In making the valuation on the accumulation basis as herein provided, individual book-keeping accounts for each member shall not be required but such valuation shall be according to age groups.

"(K) To each certificate providing a death benefit of $1000, issued or effective as of a date prior to July 1, 1919, held by and insuring a member who on July 1, 1929, has (according to his original application) attained the age of seventy years or over, shall be apportioned a credit equal to the single premium required to provide a paid-up whole life insurance of the amount indicated in the table following, according to the attained age of the insured on

the anniversary of his birth in the calendar year 1929. The credit for a greater or less certificate amount than $1000 shall be proportional thereto. To all such certificates held by or insuring members who on July 1, 1929, were, according to their original applications, under the age of seventy, shall be apportioned such credit as shall represent the excess, if any, of the cost of insurance for one year from and after July 1, 1929, over the contribution payable for that year at the rate of assessment in effect prior to said date. All credits and costs herein specified shall be computed upon the basis of the Modern Woodmen of America table of mortality and four per cent interest, and shall be applied as of July 1, 1929.

(The table of insurance credits per $1000 of certificate amount begins with age seventy, $200 paid-up whole life insurance, $125 cash withdrawal value, and continues with increasing amounts to age ninety-nine, $950 paid-up whole life insurance, $900 cash withdrawal value.)

"(L) Any member holding a certificate for insurance that became effective prior to July 1, 1919, and who on July 1, 1929, shall not have attained the age of seventy-one years, according to his original application, shall have the option, if exercised before January 1, 1930, to exchange such certificate for a certificate upon the permanent level premium basis not greater in amount by paying the rate provided for same, but not to exceed $6.50 per month per $1000 insurance, according to the member's attained age at next birthday on the date when such option is exercised, such certificate to be deemed new insurance, and the credit thereon, if any, shall be transferred to the reserve fund.

"(M) Any member holding a certificate issued for insurance that became effective prior to July 1, 1919, and who on July 1, 1929, shall have attained the age of seventy years or older, according to his original application, shall have the option, if the same is exercised before January 1,

1930, either (1) to surrender his benefit certificate and receive in exchange therefor a paid-up whole life certificate for the amount indicated in paragraph (K) hereof, provided that he may in addition to such paid-up certificate receive a new certificate of any form then issued by the society, without regard to insurability, for an additional amount such that the aggregate insurance shall not exceed the amount of the certificate surrendered for exchange, and the assessment rate upon such additional amount shall be the rate provided as of the attained age of said member at next birthday for the form and amount of certificate issued; or, in lieu thereof, (2) to surrender his benefit certificate and receive disability benefits according to the cash withdrawal values per $1000 of his certificate amount specified in paragraph (K) of this section.

"(N) Certificates issued upon any of the options specified in these by-laws shall be deemed certificates for new insurance, and the credits, if any, on certificates surrendered in exchange therefor shall be transferred to the reserve fund.

"(O) A special fund is hereby established designated 'accumulated credits fund,' into which shall be transferred from time to time from the benefit fund sufficient amounts to provide the credits to individual certificates, as set forth in paragraphs (K) and (L) for the use and benefit of members holding certificates for insurance that became effective prior to July 1, 1919.

"(P) All the foregoing provisions of section 42 shall be in force and effect from and after July 1, 1929."

At the same time section 100, which provided for disability benefits to members of the age of seventy years and over, was repealed. On June 1, 1929, about 45,000 members were past seventy years of age, and when they should become disabled were eligible to take benefits under section 100 amounting to a total of about $50,000,000, which exceeded the total surplus.

The right of a fraternal beneficiary society to amend its by-laws in the manner provided for in the laws of the society where the certificate of membership provides that the member shall be bound by the rules and regulations of the society existing at the time the certificate was issued or thereafter enacted is firmly established, and extends to by-laws increasing rates, changing the plan of assessment for the general good and changing other terms of the contract, provided such amendments are not arbitrary and unreasonable. (*Fullenwider* v. *Royal League,* 180 Ill. 621; *Knights of Pythias* v. *Kutscher,* 179 id. 340; *Baldwin* v. *Begley,* 185 id. 180; *Apitz* v. *Knights of Honor,* 274 id. 196; *Steen* v. *Modern Woodmen,* 296 id. 104; *United Order of Foresters* v. *Miller,* 178 Wis. 299; *Case* v. *Supreme Tribe of Ben Hur,* 106 Neb. 220; *Funk* v. *Stevens,* 102 id. 681; *Knights of Pythias* v. *Mims,* 241 U. S. 574; *Knights of Pythias* v. *Smyth,* 245 id. 594.) This rule is not questioned by the appellants, but they contend, first, that the attempt to repeal section 100 of the by-laws is void because it attempts to impair vested rights and obligations existing in the insurance certificates and to take property without compensation or due process of law, in violation of sections 2 and 14 of article 2 of the constitution; second, that fixing rates at the age of entry as to those who joined the society after 1919 and at attained ages as to those joining prior to that time was unreasonable and discriminatory and divided the society into two classes, placing all the burden of re-adjustment on one of such classes, and was therefore void; third, that the allocation of the surplus was an illegal use of such funds and was void; and fourth, that such allocation and classification were made under the assumed authority of the act of June 16, 1919, entitled, "An act relating to fraternal beneficiary societies and providing that funds and assets should be held for the benefits promised in its certificates," (Laws of 1919, p. 614,) which act, they contend, is void for the reason that it vio-

lates sections 2 and 14 of article 2 and section 13 of article 4 of the constitution of Illinois and the fourteenth amendment of the Federal constitution.

Concerning the first objection, it appears from the bill and answer that section 100 was adopted in 1917, and provided that any beneficial member in good standing, seventy years or more of age, who had become disabled so that he could not perform the ordinary duties of life, might, upon surrendering his certificate for cancellation and releasing the society from all claims under it, withdraw from the society or as a beneficial member thereof, and upon complying with the regulations of the executive council in regard to such withdrawal and release should be entitled to receive, at the time he surrendered his certificate and furnished the release, a disability benefit equal to all benefit assessments paid by him on account of the certificate surrendered. This section, as we have stated, was repealed in the plan of readjustment adopted in 1929. By reason of age limitations it is apparent that no member joined the society after the adoption of this section who had attained the age of seventy before its repeal. Three of the complainants and intervenors who joined the society prior to the adoption of section 100 had attained the age of seventy prior to June 6, 1929. They continued, however, as members of the society and paid their dues and assessments after arriving at the age of seventy. This was true of many others similarly situated. Prior to June 6, 1929, $7,950,494.55 had been paid in disability benefits under section 100. These disability benefits were a voluntary additional burden assumed by the society in the twelve years of the existence of the by-law, and it is conceded that at the time of the re-adjustment in 1929 there were 45,000 members of the society who prior to June 6, 1929, had attained the age of seventy years, and were entitled under section 100, if they chose to do so, to withdraw at once from the society approximately $50,-000,000. So far as complainants and all similarly situated

are concerned, there was no additional consideration for the granting of this benefit and no provision was made for the collection of any additional amounts to make the additional payments. The only result of the by-law was to create a large liability, immediately due, if demanded, with a possible serious reduction in the society's degree of solvency. None of the complainants and intervenors had made application for disability benefits, though three of them had reached an age when they were entitled so to do. Their certificates contained no provision for the payment of disability benefits. They had no contract right or right of estoppel which made it unreasonable, arbitrary or inequitable for the society to repeal the by-law, which was a menace to its solvency. The repeal, therefore, violated no vested rights in them and was not obnoxious to the constitutional inhibition of the impairment of the obligation of contract or deprivation of property without due process of law. (*United Order of Foresters* v. *Miller, supra.*) While the last cited case, and numerous other well reasoned authorities in this country, seem to justify the rescission and cancellation of old-age disability provisions as a proper exercise of the reserve power to amend where such course is necessary to save the solvency of the society, the intervenors here do not bring themselves within a situation requiring that we decide whether such power exists.

The second contention is that the re-adjustment, by applying rates to members joining the society before July 1, 1919, at their attained ages and to those joining after that date at age of entry, was unreasonable, discriminatory and void. The determination of this contention requires a consideration of the condition of the society at the time of such re-adjustment.

When it became evident in 1919 that the method of operation of the society was unsound because based upon a table of rates which were insufficient, it would have been a reasonable regulation to require all the members of the

association to begin over at that time and to pay assessments at rates fixed according to the ages of the members at the date when the change of rates occurred. (*Case* v. *Supreme Tribe of Ben Hur, supra; Funk* v. *Stevens, supra; Thomas* v. *Knights of Maccabees,* 85 Wash. 665; *Reynolds* v. *Royal Arcanum,* 192 Mass. 160; *Hollingsworth* v. *Royal Arcanum,* 175 N. C. 615; *Knights of Pythias* v. *Mims, supra; Knights of Pythias* v. *Smyth, supra.*) Such an increase of assessments would have been no hardship whatever, in a legal sense, upon any member, however it may have affected him economically, for each would have been raised proportionately to all the rest, would have had to pay no more in the future than experience showed was necessary to pay the cost of his insurance at his attained age, and he would have had the protection of the insurance which he had carried during· the previous years at less than its cost. This was not, however, the plan adopted. Each member was re-rated not according to his attained age at the time but according to his age when he became a member. This was no remedy for the condition which existed and. resulted only in the postponement of the evil day. The whole plan of re-adjustment remained subject to the original vice that the great majority of the members were paying at rates insufficient to meet the obligations of the certificates. There were nearly a million members, perhaps more, on July 1, 1919, who had been admitted prior to that date. Almost the entire amount contributed by these members had been exhausted in the payment of matured certificates of others, leaving nothing to pay certificates subsequently maturing except future assessments and the surplus accrued on all the certificates, amounting in the aggregate to $2,000,000. Each member of the several hundred thousand who constituted the society on July 1, 1919, was required to pay, and did pay, only an inadequate rate, because it was the rate specified in the table of rates for the age at which he had entered the so-

ciety, perhaps one or twenty or thirty years earlier. His rate at forty-five years if he had been a member for twenty years was the same as that of a member twenty-five years old who became a member after July 1, 1919; that is, in such case each would pay the same rate, one dollar, the rate for age twenty-five years, while the table of rates adopted fixed a rate of two dollars for age forty-five years. Of two men each forty-five years old the new member would pay two dollars, while the old member, if he had been admitted twenty-five years, would pay only eighty-five cents. The two should have paid the same rate, because the surplus which had accumulated was so small as to have no practical effect in the determination of rates. The cost of insurance of two men of the same age would therefore be the same and the rate paid for it should have been the same. No attempt was made in 1919 to establish a reserve fund, and no regulation was adopted in regard to the $2,000,000 which had accumulated from the payments of the members before July 1, 1919. After that date the members of the society paid their assessments at the rates fixed by amended section 42. New members were admitted to the number of more than 420,000, who paid assessments at the rates fixed by the by-laws. After operation for less than ten years under section 42 had produced the condition indicated by the figures which have been cited in regard to receipts, disbursements, surplus, deficit and per cent of solvency, the amendment of 1929 was adopted to put the business of the society on a more satisfactory basis. The following extract from the answer of the defendants throws further light on the condition of the society when the head camp, at its meeting beginning on June 4, 1929, took the action complained of in this proceeding:

"The defendants, further answering, state that by valuation the ratio of assets to liabilities, which represents the difference between present assets plus present value of future payments as related to the present value of insurance

in force as here shown for respective years, as follows: December 31, 1917, 34.99; December 31, 1923, 55.97; December 31, 1924, 55.89; December 31, 1925, 55.60; December 31, 1927, 54.17; December 31, 1928, 51.95.

"The defendants, further answering, state that the members joining the society since July 1, 1919, paid into the benefit fund of the society up to the close of 1928, $17,822,900. · The claims accruing among that class of members amounted to $6,150,500. The reserve accumulation upon that business on said date was $8,979,869. This leaves a surplus of $2,692,531 paid in by the members joining since July 1, 1919, after paying their claims and setting up the required reserve, which amount remained in the benefit fund and was allotted by the 1929 head camp to the members joining the society prior to July 1, 1919.

"The defendants, further answering, state that on December 31, 1928, of the members joining prior to July 1, 1919, there was at ages twenty-seven to sixty-six, inclusive, a total of $963,238,000 of insurance in force. The present value as of that date of that insurance was $450,-393,637.24. The present value of the future contributions from that group of insurance was on December 31, 1928, $174,150,515.04, or a ratio of assets to liabilities of 38.66.

"The defendants, further answering, state that on December 31, 1928, of the members joining prior to July 1, 1919, there was at ages sixty-seven, sixty-eight and sixty-nine a total of $77,358,000 of insurance in force, the present value of which was $53,135,903.95. The present value of the future contributions to be received from that group of insurance was $10,504,158.60, or a ratio of assets to liabilities of 19.76.

"The defendants, further answering, state that on December 31, 1928, of the members joining prior to July 1, 1919, there was at age seventy and over, a total of $88,-323,000 of insurance in force. The present value of that insurance was $76,526,589.75. The present value of future

assessments from that group of business was $9,714,126.08, or a ratio of assets to liabilities of 12.69.

"The defendants, further answering, state that the rates in force on December 31, 1928, would pay on each $1000 of promised benefits outstanding, $519.50. Under said rates in force at said time, (there being no provision for the payment of $480.50 on each $1000 of promised benefits outstanding, based upon twelve assessments per year,) on December 31, 1928, the total assets, actual and contingent, were $354,401,629.40; total liabilities, contingent, $678,-544,427.50; ratio of assets to liabilities, 52.23 per cent; accrued claims $3,692,404.23; ratio of total assets to total liabilities, 51.95 per cent; deficiency in reserve as of the date last above referred to, $327,835,202.33. On the 31st day of December, 1928, the total admitted assets amounted to the sum of $39,230,746.73. In order for the defendant society to be able to pay the full amount of the certificates as they matured, according to the rates in force on said 31st day of December, 1928, outstanding as of the date last above set forth, based on twelve assessments per year, the said defendant society should have had on hand at said date the sum of $327,835,202.33. The insurance in force as of December 31, 1928, amounted to the sum of $1,697,-700,000. The amount of funds on hand on the 31st day of December, 1928, less accrued and unpaid claims, was $39,230,746.73."

The appellant Edward W. Jenkins became a member of the society on January 6, 1906, at the age of thirty-four years, and received a certificate for $2000. He paid benefit fund assessments at the rate of seventy-five cents a month for each $1000 according to the rate prescribed in the table of 1903 until July 1, 1919, and at the rate of $1.30 a month for each $1000 from July 1, 1919, according to the table effective on that date, to June 1, 1929, making a total of $538.70 for $2000 of insurance for twenty-three years. The appellant William H. Taylor became a member of the

society on February 2, 1898, at the age of twenty-five years, and received a certificate for $2000. He paid benefit fund assessments at the rate of forty cents a month for each $1000 to January 1, 1904, according to the table of rates at the time he was admitted, of fifty cents a month for each $1000 from January 1, 1904, to July 1, 1919, and at the rate of one dollar a month for each $1000 from July 1, 1919, to June 1, 1929, a total of $462.80 for $2000 of insurance for thirty-one years. The appellant John Brauninger became a member of the society on June 12, 1905, at the age of thirty-eight years. He received a certificate for $2000 and paid as benefit assessments to July 1, 1919, at the rate of eighty-five cents a month for each $1000 and from July 1, 1919, to June 1, 1929, at the rate of $1.50 a month for each $1000, a total of $625.90 for $2000 of insurance for twenty-four years. The appellant Thomas Purviance became a member of the society on April 15, 1898, at the age of forty years. He received a certificate for $3000 and paid as benefit fund assessments at the rate of fifty cents a month for each $1000 to January 1, 1904, at the rate of ninety cents for each $1000 from January 1, 1904, to July 1, 1919, and at $1.50 a month for each $1000 from July 1, 1919, to June 1, 1929, a total of $1086 for $3000 insurance for thirty-one years. The appellant John W. Upchurch became a member of the society on May 29, 1895, and received a certificate for $2000. He paid as benefit fund assessments at the rate of forty-five cents a month for each $1000 to January 1, 1904, at the rate of eighty cents a month for each $1000 from January 1, 1904, to July 1, 1919, and at the rate of $1.45 a month from July 1, 1919, to June 1, 1929, a total of $699.10 for $2000 of insurance for thirty-four years.

The rate actually paid by these appellants for the insurance they have carried during the time they have been members of the society, ranging from twenty-three to thirty-four years, has been $7.47 for Taylor, who became

a member at the age of twenty-five years; $11.71 for Jenkins, who became a member at the age of thirty-four years; $10.28 for Upchurch, who became a member at the age of thirty-seven years; $13.04 for Braunniger, who became a member at the age of thirty-eight years; $11.68 for Purviance, who became a member at the age of forty years. These figures illustrate the inequality and unfairness of the re-adjustment of 1919 in applying the rates to the ages of admission of the members instead of to their attained ages. Where the amounts theretofore paid had been entirely consumed by the cost of insurance it would necessarily cost as much to carry the member in the future as it would a new member of the same age and the same rate should apply to both.

The condition confronting the society in June, 1929, justified grave apprehension as to its continuing ability to meet its obligations as they matured. The danger of insolvency may not have been immediately imminent, but the tendency in that direction was sufficiently apparent to require those charged with the duty of managing the affairs of the society to act to prevent the threatened disaster. Though the society had funds of more than $39,000,000 on hand, the basis on which it was operating was unsound and unsafe, and the reason of the unsoundness and danger was the want of uniformity and equality in the relation of the members to the society. The society was organized upon the principle of equality and mutuality among its members, and where that principle has been departed from the welfare of the society requires a re-adjustment of its affairs to restore the condition of mutuality and equality. Its power to amend its by-laws includes the power to raise the rates to such point as is necessary to enable it to go on, and this although the by-laws expressly provide that each member shall pay the same amount on his assessment so long as he remains a member. (*Knights of Pythias* v. *Mims, supra; Knights of Pythias* v. *Smyth, supra.*) Even

a change from the assessment plan of insurance to the legal reserve flat premium plan is within the power of a fraternal beneficiary society where the right to amend the by-laws and to bind the members by after-enacted by-laws is reserved by the contract of insurance. (*Wright* v. *Minnesota Mutual Life Ins. Co.* 193 U. S. 657.) The appellants concede the right of the society to increase rates where the right has been reserved in the by-laws and in the benefit certificates, and the authorities hold that the legislature may change the statutes affecting such companies within constitutional limitations, and the companies may change the by-laws under a power expressly reserved where the action is not fraudulent or arbitrary. (*Messer* v. *Grand Lodge A. O. U. W.* 180 Mass. 321; *Delaney* v. *Grand Lodge A. O. U. W.* 138 N. E. 918; *Reynolds* v. *Royal Arcanum, supra; Hollingsworth* v. *Royal Arcanum, supra; Royal Arcanum* v. *Green,* 237 U. S. 531; *Thomas* v. *Knights of Maccabees, supra.*) Though the increase of the assessment should be so great as to make the insurance unprofitable and prohibitive to old members, that fact, alone, would not make the rate unreasonable if the assessment is no more than experience has shown is necessary to meet the cost of the insurance at the attained age of such members. It may be, and in this case it is the fact, that insurance has been furnished in the past at rates below cost, members have lived and had the value of their assessments in the protection given them, and when it is found that each must pay in exact accord with the risk the society has assumed in carrying them they cannot complain. *Case* v. *Supreme Tribe of Ben Hur, supra; Knights of Honor* v. *Bieler,* 105 N. E. 244; *McClement* v. *Supreme Court I. O. F.* 222 N. Y. 470; *Everett* v. *Catholic Benevolent Legion,* 236 id. 62; *Funk* v. *Stevens, supra.*

In applying increased rates it was necessary to give consideration to the previous inequality of contributions, so that no member should have an advantage over another

but every member should have the benefit of his contributions to the benefit fund in proportion to the amount of his payment. Section 42 provided for the establishment of a reserve fund, into which would be transferred from the benefit fund as of July 1, 1929, a sum equal to the level permanent reserve based on the Modern Woodmen of America table of mortality and four per cent on all insurance in force on said date which became effective as new insurance subsequent to July 1, 1919, and, immediately following the annual valuation as of December 31 in each calendar year, such sum as should represent the accretion to reserves for the previous year upon all certificates for new insurance issued subsequent to July 1, 1919, this reserve fund not to be drawn upon for any purpose except the withdrawal of reserves on individual certificates the reserves for which were included in the fund, which was to be maintained separate and distinct from other assets in trust for the protection and payment of the sums agreed to be paid as expressed in certificates the reserves for which were included in the fund. All certificates for new insurance issued subsequent to July 1, 1919, were required to be valued on the net level premium basis annually as of December 31 and to be upon the standards of mortality and interest employed in the calculation of contribution rates. The required reserves as determined by such valuation were to be maintained at all times and assets representing them to be carried in the reserve fund. Certificates issued after July 1, 1929, at attained age rates in exchange for prior issues surrendered or canceled, or for paid-up insurance, as provided in the by-law, were to be deemed certificates for new insurance, and reserves for such certificates were to be transferred to the reserve fund. All certificates issued after July 1, 1919, whether an initial certificate of a new member or issued to replace one canceled, were based on adequate rates, and the reserve necessary to the maturity of such certificates was thereby

provided. Was this plan discriminatory and unreasonable? In the consideration of this problem it is necessary, first, to call attention to certain established and recognized principles of life insurance as applicable to the society here involved.

Life insurance by the assistance of mortality tables has been reduced substantially to mathematical calculation. The benefits paid to beneficiaries are usually denominated "insurance cost." Cost is established by mortality tables and invariably increases with age. It has nothing to do with insurance rates. It is the toll annually taken from the insurer's assets. To make payment of certificates secure, rates must be so fixed and paid as to insure a sum sufficient to meet insurance cost. Mortality tables are drawn from past experience and show the number of deaths per thousand persons occurring at each age. This number advances as the age advances. From such tables it is possible to deduce with accuracy the usual length of life. This period is termed expectancy. Insurance cost is the sum necessary to be paid in during the period of expectancy to amount, with interest accretions, to the face of the policy. Two methods are recognized in fixing the rates of such payments—the "step" rate and the "level" rate. The former is based on the principle that the insured pays only so much as the society may require to meet its death losses for that year in the membership of the age of the insured. This is also called "current cost" rate. Since the death rate among members of the age of the insured increases as that class grows older the payments of the insured increase, until in late life they become very high, though the total of all his payments but meet the cost of his insurance. By the second plan, or "level" rate plan, the insured begins at once to pay an amount each year which will in the period of his expectancy be sufficient, with interest accretions, to pay the face of his policy. Whether the "step" or "level" rate plan is used the total amount paid is the same.

In a fraternal benefit society, where all matured certificates are to be paid out of a benefit fund and the rights and obligations of the members are mutual, each being an insurer and an insured, it is necessary that the payments shall be mutual. "Mutuality" is a term which designates payment for insurance in exact proportion to its cost. If a fraternal benefit society lacks mutuality in payment for the insurance afforded it faces inevitable ruin. If some pay adequately and others do not there is still want of mutuality, and the financial ruin of the society, though postponed, is none the less inevitable. It follows that in any re-adjustment of rates it is necessary to the continued existence of the society that there be mutuality—*i. e.,* that each member pay his total insurance cost, whether by the "step" or the "level" rate. It is the duty of the society to re-adjust its rates on that basis as soon as it discovers want of mutuality. Experience has shown that upon no other basis can a fraternal benefit society or any other insurance organization continue.

The Modern Woodmen of America is a mutual fraternal benefit society. Its members are its insurers as well as the insured. All who enter it must be held to know what is indisputably shown by the very nature of the purpose of the enterprise. If one hundred men mutually agree to pay each other $1000 at death, the $100,000 must be gathered from the promisors if all are to be paid. Adding a member to the one hundred does not change the situation, for with each additional member there comes an additional obligation to pay $1000 to his beneficiaries. While the one hundred and first man mutually agrees to help pay the death losses of the one hundred, each of the one hundred has his obligations increased by the addition of such new member, and if there be not contributed enough to pay all, it but postpones the evil day to add to the membership. The theory for so many years adopted by fraternal benefit associations, that the society would continue solvent indefinitely

by the addition of new blood, is as fallacious as that of the merchant who thought he could succeed by selling goods below cost if he only sold enough of them. Individuals joining a society of this sort are not dealing in a contract at arm's length, each concerned only in the promise of others to pay, but, as expressed in *Knights of Pythias* v. *Mims, supra,* "they are joining a club the members of which have to pay any benefit that any member can receive. The corporation is simply the machine for collection and distribution. * * * The essence of the arrangement was that the members took the risk of events."

The certificate is not a contract to pay a certain amount at all events on the payment of a stipulated sum, but as a part of that contract appellants agreed to be bound by any by-law subsequently adopted by the order, subject only, as hereinbefore stated, to the condition that it be not unreasonable or tainted with fraud. The early policy pursued by this society spelled certain ruin. Surely no one can have a vested right in a disaster. There was in this readjustment of rates, therefore, no violation of contract rights of appellants. *Delaney* v. *Grand Lodge,* 244 Mass. 556, 138 N. E. 918; *Knights of Pythias* v. *Mims, supra; Funk* v. *Stevens, supra; Thomas* v. *Knights of Maccabees, supra.*

It is argued, however, that it is unreasonable and discriminatory to so raise the rates of members joining the society prior to July 1, 1919, as to cause them to carry the entire burden of the mistakes of the whole society, and that such amounts to an unjust and unreasonable classification. Counsel cite as supporting this contention, *Tusant* v. *Grand Lodge,* 183 Iowa, 489, *Case* v. *Supreme Tribe of Ben Hur, supra, Ebert* v. *Mutual Reserve Fund Life Ass'n,* 81 Minn. 116, and *Benjamin* v. *Mutual Life Ass'n,* 146 Cal. 34. In the last two cases cited the defendants were mutual life insurance companies; in the first two they were fraternal benefit associations. The *Benjamin case* is to be distin-

guished from the instant case in that two antagonistic classes were built up, with different rates of assessment on the same age. Likewise in the other three cases cited, classes had been formed which were antagonistic. In the instant case two classes existed in this society prior to July 1, 1929, by reason of the inadequate rate adjustment of 1919, when the representatives of the membership voted an adequate rate on members to come in in the future and an inadequate rate on themselves. The re-adjustment of 1929 removed this distinction and placed all members on an adequate rate. The views expressed in the *Tusant case* and other above cases cited by appellants, concerning the power of a fraternal benefit society to so raise its rates as to put all members on an adequate basis, are not in accord with the weight of authority in this country. *United Order of Foresters* v. *Miller, supra; Knights of Pythias* v. *Smyth, supra; Reynolds* v. *Royal Arcanum, supra; Thomas* v. *Knights of Maccabees, supra; Funk* v. *Stevens, supra; Fowler* v. *Sovereign Camp W. O. W.* 106 Neb. 192; *Hollingsworth* v. *Royal Arcanum, supra; Delaney* v. *Grand Lodge, supra.*

It is argued that the rates of all members should have been raised and that it is unreasonable to raise only those entering before July, 1919. This argument seems to concede that the society was empowered in 1919 to so raise the rates on all members that each would be on an adequate rate and that such an adjustment would not be unreasonable. What was done was to adopt an adjustment plan which put future members on an adequate rate but left the then members on a still inadequate rate. Thus two classes were created, each paying a different character of rate. This was wanting in mutuality. Therefore, when the membership as it stood on July 1, 1919, was in 1929 moved up to an adequate rate, that was done, merely, which it is conceded should have been done in 1919. Thus class distinction in membership was removed. Members on July 1, 1919, continued for ten years to receive the benefit of in-

surance for which they were not paying an adequate rate, while those coming in afterward were required to pay a higher rate for the same insurance. Legally, therefore, the older members cannot complain.

To increase the number of assessments or impose on those joining since July, 1919, a higher rate would be to require them to pay more than the cost of their insurance, again destroying mutuality, with the result that those members would be driven out of the society, leaving those, only, who have not been paying an adequate rate, and who would then be without the benefit of the assistance which they have enjoyed for the last ten years without paying in full for it. From the membership coming in since 1919 has come a large part of the more than $39,000,000 surplus allotted in the adjustment of 1929 and to which reference will be further made in this opinion.

This plan of adjustment did not create two classes of members, as supposed, but, on the contrary, consolidated two classes then existing. Section 42 authorizes the putting aside of a reserve fund for all new insurance after 1919. New insurance includes all members joining before 1919 who exchange their certificates for new ones on an adequate rate. There is thus, in fact, but one reserve fund. Those who do not accept the "level" rate are required only to pay the current cost of their insurance, and so, of course, contribute nothing to a reserve fund. There is, however, but one benefit fund. All certificates maturing have equal right to be paid out of that fund so long as it exists, and this even though reserves built up by those contributing on the "level" rate must be invaded to make such payment, for such is of the foundation structure of a fraternal benefit society. All death claims must be paid as they accrue so long as the society has in its hands funds collected for that purpose sufficient to pay such claims. No attempt has been made in the adoption of section 42 to change this condition. Reserves are the accumulating residue after paying the in-

surance cost of each certificate, and in a fraternal benefit society are subject, if needed, to be applied to the payment of any death claim. The *Tusant case,* relied on by the appellants, is an example of an attempt to create antagonistic classes with death losses chargeable only to each class. Such is not the effect of the re-adjustment plan here.

But counsel say this is a hardship on the older members, who must either pay an advanced rate or go on the "step" rate plan, which will become prohibitive, or accept a paid-up policy of but a fraction of the face of the certificate, or smaller cash surrender value. As we have seen, by the various clauses of section 42 such re-rated member is given an election from a number of plans, each of which either decreases the value of his certificate or increases the amount he must pay. But this, while hard for many of the older members to meet, does not render the plan unreasonable or discriminatory. (*Knights of Pythias* v. *Mims, supra; Delaney* v. *Grand Lodge, supra; United Order of Foresters* v. *Miller, supra; Reynolds* v. *Royal Arcanum, supra.*) These members have had the benefit of insurance for themselves and their families for many years at very much less than its cost to the society. Their certificates, while they have produced no income, have provided against the risk of death. Expressed in the words of Mr. Justice Holmes in *Knights of Pythias* v. *Mims, supra:* "For many years the plaintiff has been insured, and although, by what he is not likely to regard as bad fortune, his beneficiary has not profited by it, she would have if he had died. As he happily has lived, he has to bear the burdens incident to the nature of the enterprise into which he went open-eyed." So long as the society found its funds increasing appellants were able to enjoy indemnity at less than cost. With the approach of the inevitable demand for equation they find themselves forced to pay that which was during the years omitted. Though regrettable, there is no other way. The society is merely the machine for collecting the benefit funds

and disbursing them. It has no money. All certificates must be paid out of benefit funds collected. It would not be equitable to require those already paying their full share to help pay for the appellants that which they have not paid during the years gone. Section 42 is not void.

The third contention is that the allocation of the surplus was void. This was an allotment of credits to the certificates of members who joined prior to July 1, 1919. The allocation was as follows: In compliance with the plan of re-adjustment the sum of $8,979,869 of the funds on hand was set aside as a reserve for the members who joined the society since 1919; the sum of $7,342,538.73 was set aside out of the funds of the society on hand to make up the deficiencies in payments for a period of one year from and after July 1, 1929, for those who joined the society prior to July 1, 1919, and who are under the age of sixty-seven years and who are not paying current cost; and the sum of $22,908,339 was set aside out of the funds of the society to make up deficiencies in payments for a period of six months from and after July 1, 1929, by those who were sixty-seven years of age and over and to take care of the various options for those members who have reached the age of sixty-seven years and over. It is argued that this was an unwarranted and illegal diversion of the surplus.

The surplus fund is that portion of the benefit fund derived from the payment of assessments for death and disability benefits in excess of such claims. In the first place, it must be remembered that this was not a disbursement at all. The society did not part with any of this fund, nor was it transferred to the general fund, the only other fund maintained by a fraternal benefit society. The society had all the fund after the so-called allocation just as it had it all before. The allocation, so far as the transfer of funds was concerned, was merely a matter of bookkeeping. The nearly $9,000,000 placed to the credit of the certificates of those joining the society after July 1, 1919,

as a reserve, was a part of nearly $12,000,000 surplus arising out of the payments of such members. As it was designated a reserve to meet the payment of the certificates of those members, it cannot be said to be a diversion from the purposes for which it is held. The sum of $7,342,538.73 credited to the certificates of those under sixty-seven was a credit to the purpose of meeting deficiencies in the benefit fund to be derived from those certificates during the year in which such members might cancel the old and take up new certificates. This cannot be said to be a diversion of the benefit fund. The substance of what was done was a matter of book-keeping. The argument that it is to pay premiums is without force. It was an increase to that amount in the credit of those certificates in the benefit fund. It is to be used to pay death claims of such members. The sum of $22,908,339 to those over sixty-seven was to cover a like purpose for the six months' period in which they might make election from the plans offered and for the payment of the various options when selected. Such credits were similar to those made to members under sixty-seven and cannot be said to be diversions. Clearly, paid-up insurance and cash surrender payments are proper uses of the benefit fund. Such are of the purposes for which the benefit fund is held. The so-called allotment is not open to this objection.

It is also argued that this allotment is in violation of the rights of all the members; that the surplus fund was collected from all the members and all had an interest in it in proportion to the money they paid in. In so far as the members paid any part of the surplus this is true, but the mortality tables show that no member over sixty has contributed anything to this surplus but their payments have gone to pay insurance cost. This so-called surplus is only that part remaining after insurance cost is paid. Of the $39,000,000 on hand over $16,000,000 is interest on the benefit fund paid in since 1919. Over $12,000,000 of it

represents lapses since 1919. Nearly $12,000,000 of it represents surplus over insurance cost paid in by those joining the society since 1919. On this they are allotted but approximately $9,000,000. Most of this so-called surplus is allocated to the older members. While it is probably impossible to make an allocation, such as here made, in a manner equally fair to all, yet only those whose contributions are in excess of current insurance cost have any claim to the surplus created. (*United Order of Foresters* v. *Miller, supra; Thomas* v. *Knights of Maccabees, supra.*) Those over sixty-seven who have no claim to it at all receive more than half of it. Those thus losing most heavily, if it can be said there is a loss, are those joining after July 1, 1919, who are not complaining. It must be remembered that, after all, in this allocation there is no actual disbursement of the funds of the society except to those taking the cash surrender value of their certificates, which is a proper charge against the benefit fund where authorized by the by-laws, whether such fund has been allocated or remains as one entity. All certificates maturing after this adjustment may, as before, call on that fund for payment where necessary. The security of the beneficiaries is not affected by the allotment but is greatly enhanced by the plan of adjustment.

There remains the fourth contention of the appellants—that in adopting section 42 the society had no authority other than the act of 1919 relating to fraternal beneficiary societies, hereinbefore mentioned, and that such act is unconstitutional. The appellees in their answer deny that this act is the only authority for the adoption of section 42, and allege that in so doing they were acting within the powers conferred by the society's charter and by the laws of the State of Illinois, including said act of 1919, the invalidity of which they deny.

Section 1 of the act of 1893 relating to fraternal beneficiary societies (Smith's Stat. 1929, p. 1714,) provides: "Any such society, order or association may create, main-

tain and disburse a reserve fund in accordance with its constitution and by-laws. Such reserve fund, if any, shall represent certain prescribed accumulations or percentage retained for the benefit of its members or their beneficiaries, and no part thereof shall be used for expenses nor for any purpose except the payment of death and disability claims. * * * Any such society shall have the power to give a member on attaining the age of seventy years all or such portion of the face value of his certificate as the laws of the society may provide. The fund from which the payments of such benefits shall be made and the fund from which the expenses of such society shall be defrayed, shall be derived from assessments or dues collected from its members; Any fraternal benefit society which shall collect and maintain a reserve fund may, by its constitution and by-laws, grant to its members such extended and paid-up protection, or such withdrawal equities, or such cash loan privileges, as shall not exceed in value the portion of the reserve to the credit of such member or members to whom such grant is made."

It seems clear that the appellee society had ample power under this act to effect a re-adjustment such as here attempted. Under the authorities herein cited it became the duty of the society, when it became evident that the methods of its operation were unsound, to re-adjust its affairs so that it would proceed on a sound basis. This it had authority under the general act of 1893 to do. This being so, it does not become necessary to consider the validity of the act of 1919 assailed.

We find no error in the decree of the circuit court, and it will therefore be affirmed. *Decree affirmed.*