40

Bernard Fichter, Appellant, v. Milk Wagon Drivers'
Union, Local 753 of the International Brotherhood
of Teamsters et al., Appellees.

Gen. No. 41,278.

Heard in the second division of
this court for the first district at the June term, 1940.
Opinion filed November 28, 1941. Rehearing denied December
10, 1941.

FRIEDMAN, HUTLER & TOPPER, of Chicago, for appellant; RUSSELL J. TOPPER, of Chicago, of counsel.

DAVID A. RISKIND and ABRAHAM W. BRUSSELL, both of Chicago, for appellees.

MR. PRESIDING JUSTICE SCANLAN delivered the opinion of the court.

Plaintiff sues to recover disability and sickness benefits in the sum of $3,193. A jury returned a verdict finding defendants not guilty. Plaintiff appeals from a judgment entered upon the verdict.

Plaintiff became a member of the Union in the spring of 1920 and on June 15, 1928, he was involved in an accident as a result of which he claims he sustained permanent injuries to both legs. At the time of the accident there were in full force and effect by-laws adopted by the Union in 1922, which provided, *inter alia,* that a member in continuous good standing for not less than three months prior to the date of the commencement of his illness was entitled to disability benefits in the sum of twenty dollars weekly, to continue for and during the entire period of his illness provided the illness was of at least fourteen days' duration. Section 74 of the by-laws provided: "This Constitution and By-laws can be amended as follows: Any three members may over their signature, present to the union, at any regular meeting, any amendment or alteration to this constitution, and after being read at two regular meetings, shall lay over to the next regular meeting when it shall be voted upon. If the amendment or alteration receives a two-thirds vote it is adopted." From June 22, 1928, to October 5, 1937, the Union paid plaintiff sick benefits weekly in sums ranging from twenty and thirty-five dollars weekly, the amount paid depending upon the size of his family at the time of the payment. A new set of by-laws was adopted by the Union on December 12, 1935, that went into effect on January 1, 1936. The new by-laws "cancelled and superseded all previous by-laws and alterations pertaining to the sick and death bene-

fits," and omitted the provision in the 1922 by-laws relating to the payment of disability benefits. The new by-laws provided that sick benefits shall be twenty dollars per week; that after a member has been a member for one year he shall be entitled, in case of sickness, to no more than a maximum of twelve weeks of sick benefit after the first year; "and each additional year, up to and including the tenth year of continuous service, will entitle member to an additional twelve weeks of benefit. After ten years continuous employment, in good standing, the member will be entitled to sick benefit the full time he is sick." After the new by-laws went into effect plaintiff was notified by the Union that in accordance with the new by-laws he was entitled to benefit payments for only ninety-two weeks more; that the Union would carry him for ninety-two weeks more and "then he would be done." Plaintiff thereafter received from the Union benefit payments of twenty dollars a week for ninety-two weeks. At the time of the last payment he accepted from the Union a withdrawal card. That these payments to plaintiff were made by the Union in accordance with the provisions of the new by-laws is clear from the proof.

This brings us to an important question raised upon this appeal. Plaintiff contends that "a trade union is without power to adopt subsequent By-Laws binding upon pre-existing members whose rights have already vested; the right of a member to disability benefits vests the instant the disability commences," and continues as long as the disability lasts.

Defendants contend that "Sections 41 and 42 of the 1936 amendments to the by-laws regarding sickness benefits, which reduced the amounts payable and which fixed the conditions upon which any benefits were to be paid, were valid and binding upon all Union members including Fichter," even though he was still disabled at the time of the adoption of the said amend-

ments; that "under Section 74 of the by-laws of 1922
. . . the by-laws could be subsequently amended by
two-thirds vote of a regular meeting of the members";
that "a labor union, under the analogy of cases in-
volving mutual benefit associations, has a right to
amend its by-laws in the manner expressly provided
for in its original by-laws in force at the time the
claimant became a member provided the subsequent
amendments are not arbitrary or unreasonable"; that
"under the analogy of the mutual benefit association
cases, the fact that Fichter was disabled in 1936 did
not preclude the Union from complying with the terms
of Section 74 as it existed in 1920 or in 1922, and in
accordance therewith amending the disability and
death benefit provisions"; and that "the 1936 amend-
ments did not violate any 'vested right' of Fichter's
membership."

We will first refer to cases cited by plaintiff in sup-
port of his position:

In *Becker v. Berlin Beneficial Society*, 144 Pa. 232,
the by-laws of the Beneficial Society provided that a
sick and disabled member was entitled to $3.50 a week
if confined to his bed and required the attention of a
nurse, and that he should receive $2.50 a week if his
disease was of a less serious character yet so as to
incapacitate him from following and prosecuting his
professional business, "said weekly allowance to con-
tinue until a restoration to full health, or death, as
the event may happen." "The plaintiff became a
member of the society in 1855, and continued there-
after a member in good standing. Being disabled by
sickness in 1887, he received benefits from the society
at the rate of two dollars and fifty cents per week,
down to March 1, 1888, and from that date to March 1,
1889, at the rate of one dollar per week. After the
last-mentioned date, he received nothing from the
society, although, down to the date of bringing this
suit, his condition of health was such as to incapaci-

tate him from following and prosecuting his professional business. This suit was brought to recover the difference between the amount the plaintiff had received as a beneficiary, and the amount he claimed he was entitled to receive.'' On January 6, 1888, the society adopted an amendment to its by-laws which provided that the weekly disability benefit be one dollar per week. At the close of the testimony the defendant requested the court to charge (p. 233): ''The plaintiff as a member of the corporation defendant was bound by the amendments to its by-laws reducing the amounts of sick benefits, and was not entitled to receive any larger sum, after the date of the respective amendments, than was therein provided; and if the jury find from the evidence that plaintiff, at the time he brought suit, had received all that was due him under said amendments, he cannot recover in this case.'' The court (p. 234) ''refused the foregoing point, pro forma, and instructed the jury to find for the plaintiff, reserving the question of law 'whether the defendant corporation had the power, under its charter and constitution, to adopt the amendments passed January 6, 1888, and March 1, 1889, and thereby bind the plaintiff.' '' The jury returned a verdict in favor of the plaintiff for $158. The defendant then filed a motion for judgment *non obstante veredicto*. The trial court held that ''these amendments were not binding on the plaintiff; (a) because the method of their adoption was illegal; and (b) because, even by a lawfully adopted by-law, he could not be deprived of vested rights,'' and entered a judgment for plaintiff upon the verdict. The defendant appealed. The short opinion of the upper court follows (pp. 234, 235): ''Per Curiam: We think the learned judge below took the correct view of this case. Briefly stated, it is as follows: Some time after the defendant society became liable to the plaintiff for dues at the rate of two dollars and fifty cents per week, and after

it had paid them for more than one year, it proceeded to amend its by-laws so as to reduce the amounts of benefits. This was certainly an easy mode of relieving the society from an obligation, and if successful, will doubtless be followed by other similar associations. The difficulty in the way of this convenient mode of paying debts is that it is repudiation pure and simple. The argument that the plaintiff, being a member of the society, is bound by the by-law, does not meet the difficulty. It may be a good by-law as to future cases, but at the time it was passed the plaintiff was something more than a member. He was a creditor whose rights had previously attached, and those rights cannot be swept away by such a scheme as this by-law. Since the above was written, our attention has again been called to the case of *St. Patrick's Benef. Soc. v. McVey,* 92 Pa. 510. That case, however, does not conflict with this, for the reason that the resolution to suspend the weekly payment of benefits was passed before McVey became entitled to benefits as a sick member. He was a member of the society at the time, and bound by the resolution. There was no attempt to deprive him of benefits after the society became chargeable therefor.''

In *Maheu v. L'Union Lafayette,* 98 Atl. (Me.) 821, the court was called upon to decide a question of law based upon an agreed statement of facts. The decision is a short one and we quote it in full: ''The agreed statement shows that the defendant is a fraternal benefit association, whose principal object is to establish by monthly contributions by the members 'a benefit fund for sick associates, and after their death for the heirs.' The plaintiff is a member. It does not appear that any benefit certificate was issued to him. But at the time he became a member, under the by-laws, sick members were entitled to benefits at the rate of $5 a week for 13 weeks in each year. After the plaintiff became ill, and after he had received $325

as sick benefits, the defendant amended its by-laws so as to limit the total amount any sick member would be entitled to receive to $325, or $5 a week for 65 weeks. And the defendant, relying upon the amended by-laws, refuses to pay any more sick benefits to the plaintiff. The plaintiff contends that the amendment, adopted after he became ill, does not affect his rights. We think the plaintiff's contention must be sustained. We are not called upon to consider the general question whether a fraternal benefit society may, by amendment of its by-laws, increase its assessment rates, or reduce its sick or death benefits, so as to affect existing members. The authorities seem to be divided irreconcilably on this question. The leading case in support of the power is *Reynolds v. Royal Arcanum,* 192 Mass. 150. The leading case opposed is *Wright v. Maccabees,* 196 N. Y. 391. The question here is whether after a member has become ill, and his right to sick benefits has attached, the society can defeat his right and repudiate its existing obligation by amending its by-laws. If so, it is an easy way to discharge liabilities. We think it cannot. Such an amendment is wholly unreasonable and void, as respects liabilities already incurred. *Becker v. Berlin Beneficial Society,* 144 Pa. 232, is exactly in point. Judgment for plaintiff. Damages to be assessed at nisi.''

In *Crnic v. Croatian Fraternal Union of America,* 89 S. W. (2d) (Mo.) 683, there was presented, *inter alia,* a question similar to the one presented in *Becker v. Berlin Beneficial Society, supra,* and *Maheu v. L'Union Lafayette, supra.* The court, in passing upon the question, said (pp. 690, 691) : ''If the amendatory sections to plaintiff's [defendant's] by-laws should be given effect to defeat plaintiff's action under his respective petitions herein as is further contended for by defendant, it would be to allow defendant by legislative action to defeat a vested interest of plaintiff as a member to benefits under the by-laws of the order in force

at the time his sickness and total disabilities were incurred and suffered, which is shown to have been July, 1929. Plaintiff at that time became entitled, under defendant's existing by-laws, to benefits to be paid him therefor as then provided by the laws of the order. It appears that, on July 30, 1929, at the time plaintiff became sick and totally disabled, on account of which he now seeks a recovery of benefits at that time provided by defendant's by-laws, he was paying to defendant dues which entitled him to receive sick benefits at the rate of $14 per week for the first year and $10 per week thereafter until he recovered. He had a vested interest in and to such benefits. To permit defendant, after such right had become vested, by amendatory by-laws or otherwise, to change the benefits in any manner to which plaintiff had become entitled would be to permit it to change and nullify the contract entered into with plaintiff and take away from plaintiff a substantial right conferred by the contract of membership itself. This it cannot be permitted to do. . . . [Citing cases.] To allow such is not covered by an agreement of the member to abide by and comply with and perform all the duties imposed by the by-laws, rules, and regulations of the order in force or that might thereafter be adopted, changed, or modified. Defendant's contention with respect to the availability of the amendatory sections of its by-laws effective October, 1932, as a defense herein must therefore be denied.''

In *Dotlich v. Slovene Nat. Ben. Society*, 228 N. W. (Minn.) 608, the plaintiff was suing to recover disability benefits where payments had been made for some period of time by the society and then after the enactment of a subsequent by-law it deprived plaintiff of all benefits and refused to continue the payments. The court, after referring to the agreement of the members to be bound by the existing by-laws and those that might thereafter be enacted, said (p.

610) : "Does this permit an amendment of the by-laws such as is here involved and which entirely stops and cuts off plaintiff from receiving benefits which he would have received if the by-law had not been adopted? We think not." In the *Dotlich* case the defendant claimed that as it was an Illinois corporation the laws of Illinois controlled the question before the court, and argued that under the Illinois rule plaintiff was bound by the amendment to the by-laws. But the court stated (p. 610) that "if the Illinois law and decisions are to be considered, we believe that in that state a by-law such as is here involved, under the facts in this case, would not be held valid," and the court further stated that they could find no Illinois case that indicated otherwise.

We will now refer to cases cited by defendants in support of their position:

*Floyd v. Medroes*, 55 R. I. 163, was an action of assumpsit brought for the sum of $300 which the plaintiff claimed the Cigar Makers' International Union of America owed her as the beneficiary of a death benefit or life insurance payable by reason of the death of her grandfather, a member of the Union. The question involved was whether there was any contract for such death benefit or life insurance in force between the Union and plaintiff's grandfather at the time of his death on December 22, 1933. The following excerpt from the opinion of the court shows, we think, that that case has no application to the instant question (p. 169) : "At the time when Mr. Floyd became a member, there was no provision whatever for death benefits nor was there at the time of his death. During most of the intervening time there was such a provision, which varied according to the condition of the union, financial and otherwise, and was at all times subsidiary to the main purpose of the union. There was no evidence that he ever made any application for a benefit certificate for the payment of a death

benefit, or that he ever had any such certificate, issued by the union, or that there was ever any definite or express contract for the payment of any death benefit. It is our conclusion that he had only such rights as the constitution of the union provided from time to time for the members of his class, and that these rights, so far as death benefits were concerned, could be changed or annulled at any time by any change made in the constitution by the union, in accordance with the provisions for amendment contained in the constitution itself.. This conclusion is strongly supported by the opinion of this court in *Grant v. Providence Permanent Firemen's Relief Association,* 53 R. I. 201, and the cases cited therein. As there was at the time of Mr. Floyd's death no provision in the constitution of the union for the payment of a death benefit, the plaintiff has no right to recover any such benefit by reason of his death, and we see no reason for setting aside the decision of the trial justice to that effect.''

In *Quigley v. Locomotive Engineers' Mut. Life & Accident Ins. Ass'n,* 279 N. Y. S. 858, the plaintiff sued as beneficiary under two life insurance certificates issued to her father, Patrick Quigley, by defendant, a mutual protective and fraternal benefit society. The certificates were originally issued to Quigley in 1883. The constitution and by-laws of the defendant were made a part of the contracts. There came a time when defendant's by-laws were amended to provide that certificate holders who had paid their assessments for forty years were to have their certificates paid up for life and plaintiff's father received paid-up certificates in place of those originally issued to him, and it was upon these later certificates that plaintiff sued. In 1933, defendant, claiming to find its business on an unsound actuarial basis, again amended its by-laws so as to provide that holders of paid-up certificates must again pay assessments in order to keep their certifi-

cates alive as obligations of the defendant, but to certificate holders sixty years of age or more there was given by the amended by-laws an option of surrendering their old certificates and taking new paid-up certificates for a fraction of the amount of their old ones. The upper court held that the evidence clearly showed that Quigley exercised the option to take paid-up insurance for one-half the amount of his old paid-up insurance on a nonassessment basis and surrendered to the defendant his old paid-up certificates, but that he died before defendant could issue the new certificates to him. The court held that the equities were with the defendant.

*Sammel v. Myrup,* 12 N. Y. S. (2d) 217, is not applicable to the instant case. There the defense was based upon a by-law in existence at the time of the member's admission to membership.

As to *Faso v. La Cerdese Com. Vito La Mantia Society,* 156 N. Y. S. 1090, the record before the court of review was incomplete. For instance, the particular by-law upon which the plaintiff was claiming did not appear in the record. The defendant was an Italian benefit society and its certificate of incorporation provided that it was formed "for the purpose of *voluntarily* assisting the members of the said corporation, in case of sickness," etc. The complaint alleged that plaintiff was entitled to the benefits of the "relief fund," *to be paid from the "funds of the corporation."* The answer of the defendant alleged that a resolution was unanimously carried, on October 10, 1914, that: "Owing to the fact that the society had no funds in the treasury out of which claims for sick benefits could be paid that all such payments be suspended for a period of six months beginning on the 22d day of October, 1914." The evidence showed that the society had no money that could be applied to the payment of the sick benefit. The opinion states (p. 1092): "It seems to me that a corporation which is

authorized to give only *voluntary* assistance to its members must be held to have implied power to suspend a by-law providing for sick benefits payable out of its funds whenever its funds are depleted. See *Lewin v. Koerner Benevolent Society,* 125 App. Div. 91, 109 N. Y. Supp. 101.'' (Italics ours.) It will be noted that the society was not attempting to avoid payment entirely but was merely seeking a suspension of payments for a period of six months. The reviewing court did not enter judgment for defendant but reversed and remanded the cause for a new trial.

Defendants place great reliance upon *Grant v. Providence Permanent Firemen's Relief Ass'n,* 53 R. I. 201, but we think that case is clearly distinguishable from the instant one. The defendant association was organized for the purpose of aiding sick and disabled Providence firemen. The plaintiff became a member of the Providence fire department in 1892. In 1912, while in the performance of his duties, he was severely injured and totally incapacitated from performing his duties as a fireman. In 1913 the city retired him as a fireman and placed him on the city pension list. Defendant, as required by its constitution, paid plaintiff two dollars per day from the day he was injured until he was retired on a pension and thereafter one dollar per day until April 24, 1922, when the article in its constitution creating benefits for sickness or injury was amended by adding thereto a clause providing that no member should receive benefits ''for any disability which does not prevent him from doing some kind of remunerative work.'' Defendant then ceased its payment to plaintiff and the latter sued to recover the amount he alleged was due him up to August 21, 1927. Plaintiff admitted that his injury did not prevent him from doing some kind of remunerative work after the passage of the amendment, but he contended that the defendant could not extinguish his right by amending its constitution. The Rhode Island court

stated (pp. 202, 203): "Plaintiff had no express or implied contract with defendant. His rights rest upon its constitution. Defendant's right to amend or repeal any of the provisions of its constitution was expressly reserved. The article creating benefits for injured members contains no clause prohibiting its amendment, modification or repeal. Defendant never agreed that its constitution would not be modified so as to change the conditions under which payment of benefits would be made. *Defendant was organized for the purpose of aiding sick and disabled members. If a disabled member recovered and resumed remunerative work, the reason for aiding him ceased.* The amendment was necessitated to avoid paying benefits when they were no longer needed. There is no suggestion that the amendment was not reasonably necessary in order to conserve the funds of defendant and enable it to carry out the beneficent purpose for which it was incorporated." (Italics ours.) When Grant joined the association he knew that his right to receive benefits for injuries rested upon the constitution of the association, and that defendant's right to amend or repeal the provision of the constitution in question was expressly reserved in the constitution. At the time the constitution was amended Grant was receiving a pension, *had remunerative employment,* and his claim that he should also be paid disability benefits was clearly an unconscionable one.

In *Stohr v. San Francisco Musical Fund Society,* 22 Pac. (Cal.) 1125, the court held that where both the general laws of the State and the by-laws of an incorporated society give it the right to repeal, alter or amend its by-laws it is not a breach of contract for such society to amend a by-law which provides that in case of sickness a member shall be entitled to receive ten dollars per week by limiting such allowance to a certain number of weeks thereafter although a member be sick at the time of such amendment. No case

is cited in support of the ruling and the decision seemed to turn upon the court's conclusion as to what constitutes a vested right. However, in the *Stohr* case the by-laws provided for a ten dollar weekly sick benefit but failed to specify the exact period for which the payments were to be made, and this indefiniteness seems to have been a factor in the decision, as the court said (p. 1126): "*The cases where a specific sum becomes due upon the happening of a certain event, as upon death, are not like the present. In such cases an alteration in the contract cannot be made after the fact; for that would be to make that not due which had already become due. We are inclined to think that the foregoing would apply if the by-law under consideration had specified that the weekly payments were to continue as long as the sickness continued. But it does not so specify.*" (Italics ours.) The Minnesota Supreme Court, in *Dotlich v. Slovene Nat. Ben. Society, supra,* in considering the *Stohr* case, regarded the language we have just quoted and italicized as very significant. In the case before us the by-laws, upon which plaintiff relies, provide that the sick benefits "will be paid for the entire period of illness, minus the first seven days."

In *Pain v. Socicte St. Jean Baptiste,* 172 Mass. 319, the court held that a beneficiary association, organized under the statutes, which has reserved the power to amend its by-laws without limitation or restriction, may so amend them as to affect the right of a member to future benefits under a disability existing when the amendment is made. The court quotes with approval from an English case the following (p. 322): "Where . . . the original contract . . . provides for alteration of the rules, he is bound by any subsequent alteration that may be made within the power of alteration, whatever the extent of that alteration may be." The *Pain* case holds that there was practically no limit to the society's power to amend its by-laws.

The court admitted that the doctrine it announced was inconsistent with decisions of some of the other States. The leading American case cited in support of its ruling is *Stohr v. San Francisco Musical Fund Soc., supra.* That the Supreme Court of Massachusetts later considered that the doctrine announced in the *Pain* case was too broad, see *Newhall v. American Legion of Honor,* 181 Mass. 111, opinion by Mr. Justice OLIVER WENDELL HOLMES. Furthermore, the *Pain* case is distinguishable from the instant one because Pain had consented to be bound by any after enacted by-laws. As stated in the opinion (p. 322): ". . . plaintiff had agreed that these changes duly made in compliance with the rules of the society should be binding upon him, not as a new contract, but as a part of the old contract and under its provisions." The same situation is present in the case of *Fugure v. Mutual Society of St. Joseph,* 46 Vt. 362, also cited by defendants.

Defendants cite *Jenkins v. Talbot,* 338 Ill. 441, but that case relates only to the power of a benefit society to increase the rates of assessment, and change the plan of assessment.

We are of the opinion that the weight of authority is against defendants' position, and we hold that the 1936 amendments to the by-laws were not absolutely binding upon plaintiff. Undoubtedly the Union would have the right to cease paying the benefit payments to plaintiff under certain circumstances, for instance, if he withdrew from the Union, if he recovered from his disabilities, or if he recovered sufficiently from his disabilities so that he would be able to resume remunerative work. The next contention of defendants involves certain other circumstances that the Union maintains gave it the right to cease payments after the last of the ninety-two payments had been made.

Defendants contend that "plaintiff's conduct in accepting and acquiescing in the 92 payments after no-

tification that these were his last payments in accordance with provisions of the 1936 amendments, and his acceptance of a withdrawal card on October 5, 1937, when he received what he knew was to be the last payment, showed an implied contract to conform to the benefit provisions of the 1936 by-laws. . . . His knowledge of the last payment, his recognition of the purpose of a withdrawal card as stated on its face, his conversation with the union official at the time, his apparent recognition that he no longer was in the union, his failure to object—all of these viewed with the light of the surrounding circumstances certainly warrant a reasonable man in concluding that Fichter knew he was withdrawing from the union''; that ''at the very least whether or not this 'ratification' constituted a new contract was a question of fact for the jury.'' Plaintiff's answer to this contention is: ''There is no evidence in the record to show that the benefits paid to plaintiff after January 1, 1936, were made pursuant to and in accordance with the by-laws of 1936, and that plaintiff knew of such fact; that the only evidence in the record in anywise relating to this factor is that of the plaintiff wherein he testified that he received notification of a change of by-laws in January of 1936, and that he was to receive only ninety-two more payments; that nowhere does it appear by documentary evidence, i.e., written notice to plaintiff, records of the Union, or oral evidence of Robert Fitchie [president of the Union] and Steve C. Sumner [its secretary and treasurer] that the payments were made pursuant to and in compliance with the new by-laws; that there was no evidence to show that plaintiff knew or had reason to know that the payments were regulated by the new by-laws; that the record indicates that the series of payments. were made at the same place, by the same people, in the same amounts and under conditions similar to those existing under the by-laws of 1922.'' While plaintiff argues that under

56

the evidence it should be held as a matter of law that he did not agree, expressly or impliedly, to conform to the benefit provisions of the 1936 by-laws, he also argues that "the burden of proof is upon it [defendants] to establish this affirmative defense," and further argues that "the verdict and judgment is clearly and overwhelmingly against the manifest weight of the evidence." The undisputed evidence shows that shortly after January 1, 1936, the Union notified plaintiff of the changes in the by-laws and that he would be entitled under the new by-laws to benefit payments for only ninety-two weeks more; that the Union would carry him for ninety-two weeks more and that then he "would be done." The evidence further shows that under the new amendments a member was entitled to twenty dollars a week; that plaintiff never made any objections to anyone connected with the Union regarding the changes in the benefit payments to him; that after he received the notice he received, weekly, a check for twenty dollars and receipted for the same without making any objection or protest; that for ninety-two weeks he received from the Union a check for twenty dollars a week, the amount fixed in the 1936 by-laws; that he cashed all of the checks; that from 1928 to the time the amendments went into effect he had received from the Union at least twenty-two dollars a week and sometimes as high as thirty-five dollars a week; that on October 5, 1937, plaintiff went to the Union office to receive his last sick benefit check. Plaintiff testified: "*I went in there for my last sick benefit,* it was ready for me, a check, and I signed for the check"; that one of the trustees of the Union, in the presence of Robert Fitchie and Mr. Briggs, told him to go up and see "Tad," the bookkeeper; that he then went to see Tad, who handed him a withdrawal card, dated October 5, 1937, and signed by the president and secretary of the Union; that the card contained, *inter alia,* the following: "International

Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers Honorable Withdrawal Card 1877 Sec. 86. This is to certify that the bearer hereof, Brother B. H. Fichter whose name appears on the margin of this card in his own handwriting has paid all dues and demands and withdrawn in good standing from membership in Local No. 753. This Card entitles him to re-admission to the Local Union from which the card was issued at any time, unless otherwise ordered by the Local Union.'' Plaintiff testified that he knew the purpose of a withdrawal card; that ''it is to save dues during a time that you are out''; that he took the withdrawal card and walked out, but before he left the Union headquarters he spoke to the president of the Union, who said to him, ''Well, Fichter, you can join the CCC now''; that plaintiff answered that the CCC was a ''kid organization''; that plaintiff then said goodbye to the president and left; that he ''continued to keep the card,'' although he did not sign his name on the card.

After a careful consideration of the undisputed evidence that bears upon the instant contention, we are satisfied that plaintiff's entire conduct after he received notice of the amendments to the by-laws and the payments that he would receive thereunder shows conclusively that he was willing to conform to the benefit provisions of the 1936 by-laws and that he withdrew from the Union after he had received the last payment. To adopt plaintiff's theory of the evidence would require the assumption that plaintiff in his dealings with the Union after the changes in the by-laws was acting in bad faith with the Union. If he was so acting it would not bind the Union and would avail him nothing. There are circumstances in the case that tend to show that plaintiff *at the time* was willing to abide by the amendments to the by-laws and to accept payments thereunder. The Union had treated him fairly for many years. It paid him sick bene-

fits from June 22, 1928, to October 5, 1937. The payments, prior to the new by-laws, ranged from twenty-two dollars a week to thirty-five dollars a week. All that we can ascertain from the record as to the total amount paid him is that it was somewhere between $10,692 and $17,010. During the great depression the membership in the Union had declined materially, the sick list had greatly increased, and the amount in its treasury had "dwindled away." Before 1936 the Union was compelled to dispose of some of the securities it held in order to meet the sick benefits. It was "pretty close" to bankruptcy. Plaintiff had been able to do some work in 1936 and 1937. Prior to the time that he joined the Union he was, for years, an accountant, and his testimony shows that he had filled important positions in that class of work. Dr. Summers, one of plaintiff's witnesses, testified that plaintiff was physically able to work as a bookkeeper. The jury might well have found that plaintiff *at the time the amendments took effect* felt that the Union had treated him fairly and that it was obliged to change its by-laws as to sick benefits, and that he concluded to abide by the amendments to the by-laws and to accept payments thereunder. Defendants further contend that even if reasonable men could differ in their interpretation of plaintiff's conduct, the jury's verdict should settle that phase of the evidence. We hold that the defense interposed by defendants in their instant contention is a meritorious one. If we are right in so holding it follows that the judgment of the trial court must be affirmed.

Defendants raise several other defenses to plaintiff's claim, but we need not consider them in view of the ruling that we have just made.

The judgment of the Circuit court of Cook county is affirmed.

*Judgment affirmed.*

SULLIVAN and FRIEND, JJ., concur.